# WELSH *v.* UNITED STATES

No. 76.   Argued January 20, 1970—Decided June 15, 1970

334

*J. B. Tietz* argued the cause and filed briefs for petitioner.

*Solicitor General Griswold* argued the cause for the United States. With him on the brief were *Assistant Attorney General Wilson, Francis X. Beytagh, Jr.,* and *Beatrice Rosenberg.*

MR. JUSTICE BLACK announced the judgment of the Court and delivered an opinion in which MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join.

The petitioner, Elliott Ashton Welsh II, was convicted by a United States District Judge of refusing to submit to induction into the Armed Forces in violation of 50 U. S. C. App. § 462 (a), and was on June 1, 1966, sentenced to imprisonment for three years. One of petitioner's defenses to the prosecution was that § 6 (j) of the Universal Military Training and Service Act exempted him from combat and noncombat service because he was "by reason of religious training and belief . . . conscientiously opposed to participation in war in any form." [1]  After finding that there was no religious basis for petitioner's conscientious objector claim, the Court of Appeals, Judge Hamley dissenting, affirmed the conviction. 404 F. 2d 1078 (1968). We granted certiorari chiefly to review the contention that Welsh's conviction should be set aside on the basis of this Court's decision in *United States* v. *Seeger,* 380 U. S. 163 (1965). 396 U. S. 816 (1969). For the reasons to be stated, and without passing upon the constitutional arguments that have been raised, we vote to reverse this conviction because of its fundamental inconsistency with *United States* v. *Seeger, supra.*

The controlling facts in this case are strikingly similar to those in *Seeger.* Both Seeger and Welsh were brought up in religious homes and attended church in their childhood, but in neither case was this church one which taught its members not to engage in war at any time for

---

[1] 62 Stat. 612. See also 50 U. S. C. App. § 456 (j). The pertinent provision as it read during the period relevant to this case is set out *infra,* at 336.

any reason. Neither Seeger nor Welsh continued his childhood religious ties into his young manhood, and neither belonged to any religious group or adhered to the teachings of any organized religion during the period of his involvement with the Selective Service System. At the time of registration for the draft, neither had yet come to accept pacifist principles. Their views on war developed only in subsequent years, but when their ideas did fully mature both made application to their local draft boards for conscientious objector exemptions from military service under § 6 (j) of the Universal Military Training and Service Act. That section then provided, in part: [2]

> "Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code."

In filling out their exemption applications both Seeger and Welsh were unable to sign the statement that, as printed in the Selective Service form, stated "I am, by reason of my religious training and belief, conscien-

---

[2] 62 Stat. 612. An amendment to the Act in 1967, subsequent to the Court's decision in the *Seeger* case, deleted the reference to a "Supreme Being" but continued to provide that "religious training and belief" does not include "essentially political, sociological, or philosophical views, or a merely personal moral code." 81 Stat. 104, 50 U. S. C. App. § 456 (j) (1964 ed., Supp. IV).

tiously opposed to participation in war in any form." Seeger could sign only after striking the words "training and" and putting quotation marks around the word "religious." Welsh could sign only after striking the words "my religious training and." On those same applications, neither could definitely affirm or deny that he believed in a "Supreme Being," both stating that they preferred to leave the question open.[3] But both Seeger and Welsh affirmed on those applications that they held deep conscientious scruples against taking part in wars where people were killed. Both strongly believed that killing in war was wrong, unethical, and immoral, and their consciences forbade them to take part in such an evil practice. Their objection to participating in war in any form could not be said to come from a "still, small voice of conscience"; rather, for them that voice was so loud and insistent that both men preferred to go to jail rather than serve in the Armed Forces. There was never any question about the sincerity and depth of Seeger's convictions as a conscientious objector, and the same is true of Welsh. In this regard the Court of Appeals noted, "[t]he government concedes that [Welsh's] beliefs are held with the strength of more traditional religious convictions." 404 F. 2d, at 1081. But in both cases the Selective Service System concluded that the beliefs of these men were in some sense insufficiently "religious" to qualify them for conscientious objector exemptions under the terms of § 6 (j). Seeger's conscientious objector claim was denied "solely because it was not based upon a 'belief in a relation to a Supreme Being' as required by § 6 (j) of the Act," *United States* v. *Seeger*, 380 U. S. 163, 167 (1965), while Welsh was

---

[3] In his original application in April 1964, Welsh stated that he did not believe in a Supreme Being, but in a letter to his local board in June 1965, he requested that his original answer be stricken and the question left open. App. 29.

denied the exemption because his Appeal Board and the Department of Justice hearing officer "could find no religious basis for the registrant's beliefs, opinions and convictions." App. 52. Both Seeger and Welsh subsequently refused to submit to induction into the military and both were convicted of that offense.

In *Seeger* the Court was confronted, first, with the problem that § 6 (j) defined "religious training and belief" in terms of a "belief in a relation to a Supreme Being . . . ," a definition that arguably gave a preference to those who believed in a conventional God as opposed to those who did not. Noting the "vast panoply of beliefs" prevalent in our country, the Court construed the congressional intent as being in "keeping with its long-established policy of not picking and choosing among religious beliefs," *id.*, at 175, and accordingly interpreted "the meaning of religious training and belief so as to embrace *all* religions . . . ." *Id.*, at 165. (Emphasis added.) But, having decided that all religious conscientious objectors were entitled to the exemption, we faced the more serious problem of determining which beliefs were "religious" within the meaning of the statute. This question was particularly difficult in the case of Seeger himself. Seeger stated that his was a "belief in and devotion to goodness and virtue for their own sakes, and a religious faith in a purely ethical creed." 380 U. S., at 166. In a letter to his draft board, he wrote:

> "My decision arises from what I believe to be considerations of validity from the standpoint of the welfare of humanity and the preservation of the democratic values which we in the United States are struggling to maintain. I have concluded that war, from the practical standpoint, is futile and self-defeating, and that from the more important moral standpoint, it is unethical." 326 F. 2d 846, 848 (1964).

On the basis of these and similar assertions, the Government argued that Seeger's conscientious objection to war was not "religious" but stemmed from "essentially political, sociological, or philosophical views or a merely personal moral code."

In resolving the question whether Seeger and the other registrants in that case qualified for the exemption, the Court stated that "[the] task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, *in his own scheme of things,* religious." 380 U. S., at 185. (Emphasis added.) The reference to the registrant's "own scheme of things" was intended to indicate that the central consideration in determining whether the registrant's beliefs are religious is whether these beliefs play the role of a religion and function as a religion in the registrant's life. The Court's principal statement of its test for determining whether a conscientious objector's beliefs are religious within the meaning of § 6 (j) was as follows:

> "The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition." 380 U. S., at 176.

The Court made it clear that these sincere and meaningful beliefs that prompt the registrant's objection to all wars need not be confined in either source or content to traditional or parochial concepts of religion. It held that § 6 (j) "does not distinguish between externally and internally derived beliefs," *id.,* at 186, and also held that "intensely personal" convictions which some might find "incomprehensible" or "incorrect" come within the meaning of "religious belief" in the Act. *Id.,* at 184–185. What is necessary under *Seeger* for a registrant's consci-

entious objection to all war to be "religious" within the meaning of § 6 (j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions. Most of the great religions of today and of the past have embodied the idea of a Supreme Being or a Supreme Reality—a God—who communicates to man in some way a consciousness of what is right and should be done, of what is wrong and therefore should be shunned.   If an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual "a place parallel to that filled by . . . God" in traditionally religious persons.   Because his beliefs function as a religion in his life, such an individual is as much entitled to a "religious" conscientious objector exemption under § 6 (j) as is someone who derives his conscientious opposition to war from traditional religious convictions.

Applying this standard to Seeger himself, the Court noted the "compulsion to 'goodness' " that shaped his total opposition to war, the undisputed sincerity with which he held his views, and the fact that Seeger had "decried the tremendous 'spiritual' price man must pay for his willingness to destroy human life."   380 U. S., at 186–187.   The Court concluded:

> "We think it clear that the beliefs which prompted his objection occupy the same place in his life as the belief in a traditional deity holds in the lives of his friends, the Quakers."   380 U. S., at 187.

Accordingly, the Court found that Seeger should be granted conscientious objector status.

In the case before us the Government seeks to distinguish our holding in *Seeger* on basically two grounds,

both of which were relied upon by the Court of Appeals in affirming Welsh's conviction. First, it is stressed that Welsh was far more insistent and explicit than Seeger in denying that his views were religious. For example, in filling out their conscientious objector applications, Seeger put quotation marks around the word "religious," but Welsh struck the word "religious" entirely and later characterized his beliefs as having been formed "by reading in the fields of history and sociology." App. 22. The Court of Appeals found that Welsh had "denied that his objection to war was premised on religious belief" and concluded that "[t]he Appeal Board was entitled to take him at his word." 404 F. 2d, at 1082. We think this attempt to distinguish *Seeger* fails for the reason that it places undue emphasis on the registrant's interpretation of his own beliefs. The Court's statement in *Seeger* that a registrant's characterization of his own belief as "religious" should carry great weight, 380 U. S., at 184, does not imply that his declaration that his views are nonreligious should be treated similarly. When a registrant states that his objections to war are "religious," that information is highly relevant to the question of the function his beliefs have in his life. But very few registrants are fully aware of the broad scope of the word "religious" as used in § 6 (j), and accordingly a registrant's statement that his beliefs are nonreligious is a highly unreliable guide for those charged with administering the exemption. Welsh himself presents a case in point. Although he originally characterized his beliefs as nonreligious, he later upon reflection wrote a long and thoughtful letter to his Appeal Board in which he declared that his beliefs were "certainly religious in the ethical sense of the word." He explained:

> "I believe I mentioned taking of life as not being, for me, a religious wrong. Again, I assumed Mr. [Brady (the Department of Justice hearing

officer)] was using the word 'religious' in the conventional sense, and, in order to be perfectly honest did not characterize my belief as 'religious.'" App. 44.

The Government also seeks to distinguish *Seeger* on the ground that Welsh's views, unlike Seeger's, were "essentially political, sociological, or philosophical views or a merely personal moral code." As previously noted, the Government made the same argument about Seeger, and not without reason, for Seeger's views had a substantial political dimension. *Supra,* at 338–339. In this case, Welsh's conscientious objection to war was undeniably based in part on his perception of world politics. In a letter to his local board, he wrote:

> "I can only act according to what I am and what I see. And I see that the military complex wastes both human and material resources, that it fosters disregard for (what I consider a paramount concern) human needs and ends; I see that the means we employ to 'defend' our 'way of life' profoundly change that way of life. I see that in our failure to recognize the political, social, and economic realities of the world, we, *as a nation,* fail our responsibility *as a nation.*" App. 30.

We certainly do not think that § 6 (j)'s exclusion of those persons with "essentially political, sociological, or philosophical views or a merely personal moral code" should be read to exclude those who hold strong beliefs about our domestic and foreign affairs or even those whose conscientious objection to participation in all wars is founded to a substantial extent upon considerations of public policy. The two groups of registrants that obviously do fall within these exclusions from the exemption are those whose beliefs are not deeply held and those whose objection to war does not rest at all upon moral, ethical, or religious principle but instead rests solely upon

considerations of policy, pragmatism, or expediency. In applying § 6 (j)'s exclusion of those whose views are "essentially political, sociological, or philosophical" or of those who have a "merely personal moral code," it should be remembered that these exclusions are definitional and do not therefore restrict the category of persons who are conscientious objectors by "religious training and belief." Once the Selective Service System has taken the first step and determined under the standards set out here and in *Seeger* that the registrant is a "religious" conscientious objector, it follows that his views cannot be "essentially political, sociological, or philosophical." Nor can they be a "merely personal moral code." See *United States* v. *Seeger*, 380 U. S., at 186.

Welsh stated that he "believe[d] the taking of life— anyone's life—to be morally wrong." App. 44. In his original conscientious objector application he wrote the following:

> "I believe that human life is valuable in and of itself; in its living; therefore I will not injure or kill another human being. This belief (and the corresponding 'duty' to abstain from violence toward another person) is not 'superior to those arising from any human relation.' On the contrary: *it is essential to every human relation.* I cannot, therefore, conscientiously comply with the Government's insistence that I assume duties which I feel are immoral and totally repugnant." App. 10.

Welsh elaborated his beliefs in later communications with Selective Service officials. On the basis of these beliefs and the conclusion of the Court of Appeals that he held them "with the strength of more traditional religious convictions," 404 F. 2d, at 1081, we think Welsh was clearly entitled to a conscientious objector exemption. Section

6 (j) requires no more. That section exempts from military service all those whose consciences, spurred by deeply held moral, ethical, or religious beliefs, would give them no rest or peace if they allowed themselves to become a part of an instrument of war.

The judgment is

*Reversed.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring in the result.

Candor requires me to say that I joined the Court's opinion in *United States* v. *Seeger,* 380 U. S. 163 (1965), only with the gravest misgivings as to whether it was a legitimate exercise in statutory construction, and today's decision convinces me that in doing so I made a mistake which I should now acknowledge.[1]

In *Seeger* the Court construed § 6 (j) of the Universal Military Training and Service Act so as to sustain a conscientious objector claim not founded on a theistic belief. The Court, in treating with the provision of the statute that limited conscientious objector claims to those stemming from belief in "a Supreme Being," there said: "Congress, in using the expression 'Supreme Being' rather than the designation 'God,' was merely clarifying the meaning of religious training and belief so as to embrace all religions and to exclude essentially political, sociological, or philosophical views," and held that the test of belief " 'in a relation to a Supreme Being' is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the or-

---

[1] For a discussion of those principles that determine the appropriate scope for the doctrine of *stare decisis,* see *Moragne* v. *States Marine Lines,* also decided today, *post,* p. 375; *Boys Markets* v. *Retail Clerks Union, ante,* p. 235; *Helvering* v. *Hallock,* 309 U. S. 106 (1940).

thodox belief in God of one who clearly qualifies for the exemption." 380 U. S., at 165–166. Today the prevailing opinion makes explicit its total elimination of the statutorily required religious content for a conscientious objector exemption. The prevailing opinion now says: "If an individual deeply and sincerely holds beliefs that are *purely ethical* or *moral* in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time" (emphasis added), he qualifies for a § 6 (j) exemption.

In my opinion, the liberties taken with the statute both in *Seeger* and today's decision cannot be justified in the name of the familiar doctrine of construing federal statutes in a manner that will avoid possible constitutional infirmities in them. There are limits to the permissible application of that doctrine, and, as I will undertake to show in this opinion, those limits were crossed in *Seeger*, and even more apparently have been exceeded in the present case. I therefore find myself unable to escape facing the constitutional issue that this case squarely presents: whether § 6 (j) in limiting this draft exemption to those opposed to war in general because of theistic beliefs runs afoul of the religious clauses of the First Amendment. For reasons later appearing I believe it does, and on that basis I concur in the judgment reversing this conviction, and adopt the test announced by Mr. Justice Black, not as a matter of statutory construction, but as the touchstone for salvaging a congressional policy of long standing that would otherwise have to be nullified.

## I

Section 6 (j) provided during the period relevant to this case:

"Nothing contained in this title shall be construed to require any person to be subject to combatant

training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code." Universal Military Training and Service Act of 1948, § 6 (j), 62 Stat. 612, 50 U. S. C. App. § 456 (j).

The issue is then whether Welsh's opposition to war is founded on "religious training and belief" and hence "belief in a relation to a Supreme Being" as *Congress* used those words. It is of course true that certain words are more plastic in meaning than others. "Supreme Being" is a concept of theology and philosophy, not a technical term, and consequently may be, in some circumstances, capable of bearing a contemporary construction as notions of theology and philosophy evolve. Cf. *United States* v. *Storrs,* 272 U. S. 652 (1926). This language appears, however, in a congressional enactment; it is not a phrase of the Constitution, like "religion" or "speech," which this Court is freer to construe in light of evolving needs and circumstances. Cf. *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495 (1952), and my concurring opinion in *Estes* v. *Texas,* 381 U. S. 532, 595–596 (1965), and my opinion concurring in the judgment in *Garner* v. *Louisiana,* 368 U. S. 157, 185 (1961). Nor is it so broad a statutory directive, like that of the Sherman Act, that we may assume that we are free to adopt and shape policies limited only by the most general statement of purpose. Cf., *e. g., Standard Oil Co.* v. *United States,* 221 U. S. 1 (1911). It is Congress' will that must here be divined. In that endeavor

it is one thing to give words a meaning not necessarily envisioned by Congress so as to adapt them to circumstances also uncontemplated by the legislature in order to achieve the legislative policy, *Holy Trinity Church* v. *United States,* 143 U. S. 457 (1892); it is a wholly different matter to define words so as to change policy. The limits of this Court's mandate to stretch concededly elastic congressional language are fixed in all cases by the context of its usage and legislative history, if available, that are the best guides to congressional *purpose* and the lengths to which Congress enacted a policy. *Rosado* v. *Wyman,* 397 U. S. 397 (1970).[2] The prevailing opinion today snubs both guidelines for it is apparent from a textual analysis of § 6 (j) and the legislative history that the words of this section, as used and understood by Congress, fall short of enacting the broad policy of exempting from military service all individuals who in good faith oppose all war.

---

[2] The difference is between the substitution of judicial judgment for a principle that is set forth by the Constitution and legislature and the application of the legislative principle to a new "form" that is no different in substance from the circumstances that existed when the principle was set forth. Cf. *Katz* v. *United States,* 389 U. S. 347 (1967). As the Court said in *Weems* v. *United States,* "Legislation, both statutory and constitutional, is enacted, . . . from an experience of evils, . . . its general language should not, therefore, be necessarily confined to the *form* that evil had theretofore taken. . . . [A] *principle* to be vital must be capable of wider application than the mischief which gave it birth." 217 U. S. 349, 373 (1910) (emphasis added).

While it is by no means always simple to discern the difference between the residual principle in legislation that should be given effect in circumstances not covered by the express statutory terms and the limitation on that principle inherent in the same words, the Court in *Seeger* and the prevailing opinion today read out language that, in my view, plainly limits the principle rather than illustrates the policy and circumstances that were in mind when § 6 (j) was enacted.

## A

The natural reading of § 6 (j), which quite evidently draws a distinction between theistic and nontheistic religions, is the only one that is consistent with the legislative history. Section 5 (g) of the 1940 Draft Act exempted individuals whose opposition to war could be traced to "religious training and belief," 54 Stat. 889, without any allusion to a Supreme Being. In *United States* v. *Kauten,* 133 F. 2d 703 (C. A. 2d Cir. 1943), the Second Circuit, speaking through Judge Augustus Hand, broadly construed "religious training and belief" to include a "belief finding expression in a conscience which categorically requires the believer to disregard elementary self-interest and to accept martyrdom in preference to transgressing its tenets." 133 F. 2d, at 708. The view was further elaborated in subsequent decisions of the Second Circuit, see *United States ex rel. Phillips* v. *Downer,* 135 F. 2d 521 (C. A. 2d Cir. 1943); *United States ex rel. Reel* v. *Badt,* 141 F. 2d 845 (C. A. 2d Cir. 1944). This expansive interpretation of § 5 (g) was rejected by a divided Ninth Circuit in *Berman* v. *United States,* 156 F. 2d 377, 380–381 (1946):

> "It is our opinion that the expression 'by reason of religious training and belief' . . . was written into the statute for the specific purpose of distinguishing between a conscientious social belief, or a sincere devotion to a high moralistic philosophy, and one based upon an individual's belief in his responsibility to an authority higher and beyond any worldly one.
>
> .      .      .      .      .
>
> "[I]n United States v. Macintosh, 283 U. S. 605 . . . Mr. [Chief] Justice Hughes in his dissent . . . said: 'The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation.'"

The unmistakable and inescapable thrust of the *Berman* opinion, that religion is to be conceived in theistic terms, is rendered no less straightforward by the court's elaboration on the difference between beliefs held as a matter of moral or philosophical conviction and those inspired by religious upbringing and adherence to faith.

"There are those who have a philosophy of life, and who live up to it. There is evidence that this is so in regard to appellant. However, no matter how pure and admirable his standard may be, and no matter how devotedly he adheres to it, his philosophy and morals and social policy without the concept of deity cannot be said to be religion in the sense of that term as it is used in the statute. It is said in State v. Amana Society, 132 Iowa 304, 109 N. W. 894, 898 . . . : 'Surely a scheme of life designed to obviate such results (man's inhumanity to man), and by removing temptations, and all the inducements of ambition and avarice, to nurture the virtues of unselfishness, patience, love, and service, ought not to be denounced as not pertaining to religion *when its devotee regards it as an essential tenet of their* [sic] *religious faith.*'" (Emphasis of Court of Appeals.) *Ibid.*

In the wake of this intercircuit dialogue, crystallized by the dissent in *Berman* which espoused the Second Circuit interpretation in *Kauten, supra,* Congress enacted § 6 (j) in 1948. That Congress intended to anoint the Ninth Circuit's interpretation of § 5 (g) would seem beyond question in view of the similarity of the statutory language to that used by Chief Justice Hughes in his dissenting opinion in *Macintosh* and quoted in *Berman* and the Senate report. The first half of the new language was almost word for word that of Chief Justice Hughes in

*Macintosh,* and quoted by the *Berman* majority;[3] and the Senate Committee report adverted to *Berman,* thus foreclosing any possible speculation as to whether Congress was aware of the possible alternatives. The report stated:

> "This section reenacts substantially the same provisions as were found in subsection 5 (g) of the 1940 act. Exemption extends to anyone who, because of religious training and belief in his relationship to a Supreme Being, is conscientiously opposed to combatant military service or to both combatant and noncombatant military service. (See *United States* v. *Berman* [*sic*], 156 F. (2d) 377, certiorari denied, 329 U. S. 795.)" S. Rep. No. 1268, 80th Cong., 2d Sess., 14.[4]

---

[3] The substitution in § 6 (j) of "Supreme Being" instead of "God" as used in *Macintosh* does not, in my view, carry the burden, placed on it in the *Seeger* opinion, of demonstrating that Congress "deliberately broadened" Chief Justice Hughes' definition. "God" and "Supreme Being" are generally taken as synonymous terms meaning Deity. It is common practice to use various synonyms for the Deity. The Declaration of Independence refers to "Nature's God," "Creator," "Supreme Judge of the world," and "divine Providence." References to the Deity in preambles to the state constitutions include, for example, and use interchangeably "God," "Almighty God," "Supreme Being." A. Stokes & L. Pfeffer, Church and State in the United States 561 (1964). In *Davis* v. *Beason,* 133 U. S. 333, 342 (1890), the Court spoke of man's relations to his "Creator" and to his "Maker"; in *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952), and *Engel* v. *Vitale,* 370 U. S. 421, 424 (1962), to the "Almighty."

[4] The *Seeger* opinion relies on the absence of any allusion to the judicial conflict to parry the thrust of the legislative history and assigns significance to the Committee citation of *Berman* as manifestation of its intention to reenact § 5 (g) of the 1940 Act, and also as authority for the exclusion of those whose beliefs are grounded in secular ethics. The citation to *Berman* would not be conclusive of congressional purpose if Congress had simply reenacted the 1940

## B

Against this legislative history it is a remarkable feat of judicial surgery to remove, as did *Seeger,* the theistic requirement of § 6 (j). The prevailing opinion today, however, in the name of interpreting the will of Congress, has performed a lobotomy and completely transformed the statute by reading out of it any distinction between religiously acquired beliefs and those deriving from "essentially political, sociological, or philosophical views or a merely personal moral code."

In the realm of statutory construction it is appropriate to search for meaning in the congressional vocabulary in a lexicon most probably consulted by Congress. Resort to Webster's [5] reveals that the meanings of "religion" are: "1. The service and adoration of God or a god as expressed in forms of worship, in obedience to divine commands . . . ; 2. The state of life of a religious . . . ; 3. One of the *systems* of faith and worship; a form of theism; a religious faith . . . ; 4. The profession or practice of religious beliefs; religious observances *collectively; pl.* rites; 5. Devotion or fidelity; . . . conscien-

---

Act adding only the express exclusion in the last clause. But the reasoning in *Seeger* totally ignores the fact that Congress without other apparent reason added the "Supreme Being" language of the *Berman* majority in the face of the *Berman* dissent which espoused Judge Hand's view in *Kauten.* The argument in *Seeger* is not, moreover, strengthened by the fact that Congress in drafting the 1948 Selective Service laws placed great weight on the views of the Selective Service System which, the Court suggested, did not view *Berman* and *Kauten* as being in conflict. 380 U. S., at 179. The Selective Service System Monograph No. 11, Conscientious Objection (1950) was not before Congress when § 6 (j) was enacted and the fact that the Service relied on both *Kauten* and *Berman* for the proposition that conscientious objection must emanate from a religious and not a secular source, does not mean that it considered the Supreme Being discussion in *Berman* as surplusage.

[5] New International Dictionary, Unabridged (2d ed. 1934).

tiousness; 6. An apprehension, awareness, or conviction of the existence of a supreme being, or more widely, of supernatural powers or influences controlling one's own, humanity's, or nature's destiny; also, such an apprehension, etc., accompanied by or arousing reverence, love, gratitude, the will to obey and serve, and the like . . . ." (Emphasis added.)

Of the five pertinent definitions four include the notion of either a Supreme Being or a cohesive, organized group pursuing a common spiritual purpose together. While, as the Court's opinion in *Seeger* points out, these definitions do not exhaust the almost infinite and sophisticated possibilities for defining "religion," there is strong evidence that Congress restricted, in this instance, the word to its conventional sense. That it is difficult to plot the semantic penumbra of the word "religion" does not render this term so plastic in meaning that the Court is entitled, as matter of statutory construction, to conclude that any asserted and strongly held belief satisfies its requirements. It must be recognized that the permissible shadow of connotation is limited by the context in which words are used. In § 6 (j) Congress has included not only a reference to a Supreme Being but has also explicitly contrasted "religious" beliefs with those that are "essentially political, sociological, or philosophical" and a "personal moral code." This exception certainly is, at the very least, the statutory boundary, the "asymptote," of the word "religion." [6]

---

[6] The prevailing opinion's purported recognition of this distinction slides over the "personal moral code" exception, in § 6 (j). Thus that opinion in concluding that § 6 (j) does not exclude "those who hold strong beliefs about our domestic and foreign affairs or even those whose conscientious objection to participation in all wars is founded to a substantial extent upon considerations of public policy" but excludes individuals, whose beliefs are not deeply held, and those whose objection to war does not rest upon "moral, ethical, or religious principle," but instead rests solely upon considerations of

For me this dichotomy reveals that Congress was not embracing that definition of religion that alone speaks in terms of "devotion or fidelity" to individual principles acquired on an individualized basis but was adopting, at least, those meanings that associate religion with formal, organized worship or shared beliefs by a recognizable and cohesive group. Indeed, this requirement was explicit in the predecessor to the 1940 statute. The Draft Act of 1917 conditioned conscientious objector status on membership in or affiliation with a "well-recognized religious sect or organization [then] organized and existing and whose existing creed or principles forb[ade] its members to participate in war in any form . . . ." § 4, 40 Stat 78. That § 5 (g) of the 1940 Act eliminated the affiliation and membership requirement does not, in my view, mean as the Court, in effect, concluded in *Seeger* that Congress was embracing a secular definition of religion.[7]

---

"policy, pragmatism, or expediency," *ante,* at 342–343, blends morals and religion, two concepts that Congress chose to keep separate.

[7] The apparent purpose of the 1940 change in language was to eliminate membership as a decisive criterion in recognition of the fact that mere formal affiliation is no measure of the intensity of beliefs, and that many nominal adherents do not share or pursue the ethics of their church. That the focus was made the conscientiousness of the individual's own belief does not mean that Congress was indifferent to its source. Were this the case there would have been no occasion to allude to "religious training" in the 1940 enactment, and to contrast it with secular ethics in the 1948 statute. Yet the prevailing opinion today holds that "beliefs that are purely ethical," no matter how acquired, qualify the holder for § 6 (j) status if they are held with the requisite intensity.

However, even the prevailing opinion's ambulatory concept of "religion" does not suffice to embrace Welsh, since petitioner insisted that his beliefs had been formed "by reading in the fields of history and sociology" and "denied that his objection to war was premised on religious belief." 404 F. 2d, at 1082. That opinion not only establishes a definition of religion that amounts to "Newspeak" but it refuses to listen to petitioner who is speaking the same language.

Unless we are to assume an Alice-in-Wonderland world where words have no meaning, I think it fair to say that Congress' choice of language cannot fail to convey to the discerning reader the very policy choice that the prevailing opinion today completely obliterates: that between conventional religions that usually have an organized and formal structure and dogma and a cohesive group identity, even when nontheistic, and cults that represent schools of thought and in the usual case are without formal structure or are, at most, loose and informal associations of individuals who share common ethical, moral, or intellectual views.

## II

When the plain thrust of a legislative enactment can only be circumvented by distortion to avert an inevitable constitutional collision, it is only by exalting form over substance that one can justify this veering off the path that has been plainly marked by the statute. Such a course betrays extreme skepticism as to constitutionality, and, in this instance, reflects a groping to preserve the conscientious objector exemption at all cost.

I cannot subscribe to a wholly emasculated construction of a statute to avoid facing a latent constitutional question, in purported fidelity to the salutary doctrine of avoiding unnecessary resolution of constitutional issues, a principle to which I fully adhere. See *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 348 (1936) (Brandeis, J., concurring). It is, of course, desirable to salvage by construction legislative enactments whenever there is good reason to believe that Congress did not intend to legislate consequences that are unconstitutional, but it is not permissible, in my judgment, to take a lateral step that robs legislation of all meaning in order to avert the collision between its plainly intended purpose and the commands of the Constitution.

Cf. *Yates* v. *United States,* 354 U. S. 298 (1957). As the Court stated in *Aptheker* v. *Secretary of State,* 378 U. S. 500, 515 (1964):

> "It must be remembered that '[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . .' or judicially rewriting it. *Scales* v. *United States* [367 U. S. 203, 211]. To put the matter another way, this Court will not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects."

The issue comes sharply into focus in Mr. Justice Cardozo's statement for the Court in *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933):

> " 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.' . . . But avoidance of a difficulty will not be pressed to the point of disingenuous evasion. Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power. The problem must be faced and answered."

If an important congressional policy is to be perpetuated by recasting unconstitutional legislation, as the prevailing opinion has done here, the analytically sound approach is to accept responsibility for this decision. Its justification cannot be by resort to legislative intent, as that term is usually employed, but by a different kind of legislative intent, namely the presumed grant of power to the courts to decide whether it more nearly accords with

Congress' wishes to eliminate its policy altogether or extend it in order to render what Congress plainly did intend, constitutional. Compare, *e. g., Yu Cong Eng* v. *Trinidad,* 271 U. S. 500 (1926); *United States* v. *Reese,* 92 U. S. 214 (1876), with *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942); *Nat. Life Ins. Co.* v. *United States,* 277 U. S. 508 (1928). I therefore turn to the constitutional question.

## III

The constitutional question that must be faced in this case is whether a statute that defers to the individual's conscience only when his views emanate from adherence to theistic religious beliefs is within the power of Congress. Congress, of course, could, entirely consistently with the requirements of the Constitution, eliminate *all* exemptions for conscientious objectors. Such a course would be wholly "neutral" and, in my view, would not offend the Free Exercise Clause, for reasons set forth in my dissenting opinion in *Sherbert* v. *Verner,* 374 U. S. 398, 418 (1963). See *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29 (1905) (dictum); cf. *McGowan* v. *Maryland,* 366 U. S. 420 (1961); *Davis* v. *Beason,* 133 U. S. 333 (1890); *Hamilton* v. *Board of Regents,* 293 U. S. 245, 264–265 (1934); *Reynolds* v. *United States,* 98 U. S. 145 (1879); Kurland, Of Church and State and the Supreme Court, 29 U. Chi. L. Rev. 1 (1961). However, having chosen to exempt, it cannot draw the line between theistic or nontheistic religious beliefs on the one hand and secular beliefs on the other. Any such distinctions are not, in my view, compatible with the Establishment Clause of the First Amendment. See my separate opinion in *Walz* v. *Tax Comm'n,* 397 U. S. 664, 694 (1970); *Epperson* v. *Arkansas,* 393 U. S. 97 (1968); *School District of Abington Township* v. *Schempp,* 374 U. S. 203, 305 (1963) (Goldberg, J., concurring);

*Engel* v. *Vitale,* 370 U. S. 421 (1962); *Torcaso* v. *Watkins,* 367 U. S. 488, 495 (1961); *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953). The implementation of the neutrality principle of these cases requires, in my view, as I stated in *Walz* v. *Tax Comm'n, supra,* "an equal protection mode of analysis. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders. In any particular case the critical question is whether the scope of legislation encircles a class so broad that it can be fairly concluded that [all groups that] could be thought to fall within the natural perimeter [are included]." 397 U. S., at 696.

The "radius" of this legislation is the conscientiousness with which an individual opposes war in general, yet the statute, as I think it must be construed, excludes from its "scope" individuals motivated by teachings of nontheistic religions,[8] and individuals guided by an inner ethical voice that bespeaks secular and not "religious" reflection. It not only accords a preference to the "religious" but also disadvantages adherents of religions that do not worship a Supreme Being. The constitutional infirmity cannot be cured, moreover, even by an impermissible construction that eliminates the theistic requirement and simply draws the line between religious and nonreligious. This in my view offends the Establishment Clause and is that kind of classification

---

[8] This Court has taken notice of the fact that recognized "religions" exist that "do not teach what would generally be considered a belief in the existence of God," *Torcaso* v. *Watkins,* 367 U. S. 488, 495 n. 11, *e. g.,* "Buddhism, Taoism, Ethical Culture, Secular Humanism and others." *Ibid.* See also *Washington Ethical Society* v. *District of Columbia,* 101 U. S. App. D. C. 371, 249 F. 2d 127 (1957); 2 Encyclopaedia of the Social Sciences 293; J. Archer, Faiths Men Live By 120–138, 254–313 (2d ed. revised by Purinton 1958); Stokes & Pfeffer, *supra,* n. 3, at 560.

that this Court has condemned. See my separate opinion in *Walz* v. *Tax Comm'n, supra; School District of Abington Township* v. *Schempp* (Goldberg, J., concurring), *supra; Engel* v. *Vitale, supra; Torcaso* v. *Watkins, supra.*

If the exemption is to be given application, it must encompass the class of individuals it purports to exclude, those whose beliefs emanate from a purely moral, ethical, or philosophical source.[9] The common denominator must be the intensity of moral conviction with which a belief is held.[10] Common experience teaches that among

---

[9] In *Sherbert* v. *Verner,* 374 U. S. 398 (1963), the Court held unconstitutional over my dissent a state statute that conditioned eligibility for unemployment benefits on being "able to work and . . . available for work" and further provided that a claimant was ineligible "[i]f . . . he has failed, without good cause . . . to accept available suitable work when offered him by the employment office or the employer . . . ." This, the Court held, was a violation of the Free Exercise Clause as applied to Seventh Day Adventists whose religious background forced them as a matter of conscience to decline Saturday employment. My own conclusion, to which I still adhere, is that the Free Exercise Clause does not require a State to conform a neutral secular program to the dictates of religious conscience of any group. I suggested, however, that a State could constitutionally create exceptions to its program to accommodate religious scruples. That suggestion must, however, be qualified by the observation that any such exception in order to satisfy the Establishment Clause of the First Amendment, would have to be sufficiently broad to be religiously neutral. See my separate opinion in *Walz* v. *Tax Comm'n, supra.* This would require creating an exception for anyone who, as a matter of conscience, could not comply with the statute. Whether, under a statute like that involved in *Sherbert,* it would be possible to demonstrate a basis in conscience for not working Saturday is quite another matter.

[10] Without deciding what constitutes a definition of "religion" for First Amendment purposes it suffices to note that it means, in my view, at least the two conceivable readings of § 6 (j) set forth in Part II, but something less than mere adherence to ethical or

"religious" individuals some are weak and others strong adherents to tenets and this is no less true of individuals whose lives are guided by personal ethical considerations.

The Government enlists the *Selective Draft Law Cases,* 245 U. S. 366 (1918), as precedent for upholding the constitutionality of the religious conscientious objector provision. That case involved the power of Congress to raise armies by conscription and only incidentally the conscientious objector exemption. The language emphasized by the Government to the effect that the exemption for religious objectors and ministers constituted neither an establishment nor interference with free exercise of religion can only be considered an afterthought since the case did not involve any individuals who claimed to be nonreligious conscientious objectors.[11] This conclusory assertion, unreasoned and unaccompanied by citation, surely cannot foreclose consideration of the question in a case that squarely presents the issue.

Other authorities assembled by the Government, far from advancing its case, demonstrate the unconstitutionality of the distinction drawn in § 6 (j) between religious and nonreligious beliefs. *Everson* v. *Board of Education,* 330 U. S. 1 (1947), the *Sunday Closing Law Cases,* 366 U. S. 420, 582, 599, and 617 (1961), and *Board*

---

moral beliefs in general or a certain belief such as conscientious objection. Thus the prevailing opinion's expansive reading of "religion" in § 6 (j) does not, in my view, create an Establishment Clause problem in that it exempts all sincere objectors but does not exempt others, *e. g.,* those who object to war on pragmatic grounds and contend that pragmatism is their creed.

[11] Thus, Mr. Chief Justice White said:

"And we pass without anything but statement the proposition that an establishment of a religion or an interference with the free exercise thereof repugnant to the First Amendment resulted from the exemption clauses of the act . . . because we think its unsoundness is too apparent to require us to do more." 245 U. S., at 389–390.

*of Education* v. *Allen,* 392 U. S. 236 (1968), all sustained legislation on the premise that it was neutral in its application and thus did not constitute an establishment, notwithstanding the fact that it may have assisted religious groups by giving them the same benefits accorded to nonreligious groups.[12]   To the extent that *Zorach* v. *Clauson,* 343 U. S. 306 (1952), and *Sherbert* v. *Verner, supra,* stand for the proposition that the Government may (*Zorach*), or must (*Sherbert*), shape its secular programs to accommodate the beliefs and tenets of religious

---

[12] My Brother WHITE in dissent misinterprets, in my view, the thrust of Mr. Justice Frankfurter's language in the *Sunday Closing Law Cases.* See *post,* at 369. Section 6 (j) speaks directly to belief divorced entirely from conduct. It evinces a judgment that individuals who hold the beliefs set forth by the statute should not be required to bear arms, and the statutory belief that qualifies is only a religious belief. Under these circumstances I fail to see how this legislation has "any substantial legislative purpose" apart from honoring the conscience of individuals who oppose war on only religious grounds. I cannot, moreover, accept the view, implicit in the dissent, that Congress has any ultimate responsibility for construing the Constitution. It, like all other branches of government, is constricted by the Constitution and must conform its action to it. It is this Court, however, and not the Congress that is ultimately charged with the difficult responsibility of construing the First Amendment. The Court has held that universal conscription creates no free exercise problem, see cases cited, *supra,* at 356, and Congress can constitutionally draft individuals notwithstanding their religious beliefs. Congress, whether in response to political considerations or simply out of sensitivity for men of religious conscience, can of course decline to exercise its power to conscript to the fullest extent, but it cannot do so without equal regard for men of nonreligious conscience. It goes without saying that the First Amendment is perforce a guarantee that the conscience of religion may not be preferred simply because organized religious groups in general are more visible than the individual who practices morals and ethics on his own. Any view of the Free Exercise Clause that does not insist on this neutrality would engulf the Establishment Clause and render it vestigial.

groups, I think these cases unsound.[13]  See generally Kurland, *supra*.  To conform with the requirements of the First Amendment's religious clauses as reflected in the mainstream of American history, legislation must, at the very least, be neutral.  See my separate opinion in *Walz* v. *Tax Comm'n, supra.*

## IV

Where a statute is defective because of underinclusion there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion.  Cf. *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942); *Iowa-Des Moines National Bank* v. *Bennett,* 284 U. S. 239 (1931).[14]

---

[13] That the "released-time" program in *Zorach* did not utilize classroom facilities for religious instruction, unlike *McCollum* v. *Board of Education,* 333 U. S. 203 (1948), is a distinction for me without Establishment Clause substance.  At the very least the Constitution requires that the State not excuse students early for the purpose of receiving religious instruction when it does not offer to nonreligious students the opportunity to use school hours for spiritual or ethical instruction of a nonreligious nature.  Moreover, whether a released-time program cast in terms of improving "conscience" to the exclusion of artistic or cultural pursuits, would be "neutral" and consistent with the requirement of "voluntarism," is by no means an easy question.  Such a limited program is quite unlike the broad approach of the tax exemption statute, sustained in *Walz* v. *Tax Comm'n, supra,* which included literary societies, playgrounds, and associations "for the moral or mental improvement of men."

[14] See *Skinner* v. *Oklahoma,* where MR. JUSTICE DOUGLAS, in an opinion holding infirm under the Equal Protection Clause a state statute that required sterilization of habitual thieves who perpetrated larcenies but not those who engaged in embezzlement, noted the alternative courses of extending the statute to cover the excluded class or not applying it to the wrongfully included group.  The Court declined to speculate which alternative the State would prefer to adopt and simply reversed the judgment.

362

The appropriate disposition of this case, which is a prosecution for refusing to submit to induction and not an action for a declaratory judgment on the constitutionality of § 6 (j), is determined by the fact that at the time of Welsh's induction notice and prosecution the Selective Service was, as required by statute, exempting individuals whose beliefs were identical in all respects to those held by petitioner except that they derived from a religious source. Since this created a religious benefit not accorded to petitioner, it is clear to me that this conviction must be reversed under the Establishment Clause of the First Amendment unless Welsh is to go remediless. Cf. *Iowa-Des Moines National Bank* v. *Bennett, supra; Smith* v. *Cahoon,* 283 U. S. 553 (1931).[15]

---

[15] In *Iowa-Des Moines National Bank* v. *Bennett,* Mr. Justice Brandeis speaking for the Court in a decision holding that the State had denied petitioners equal protection of the laws by taxing them more heavily than their competitors, observed that: "The right invoked is that to equal treatment; and such treatment will be attained if either their competitors' taxes are increased or their own reduced." 284 U. S., at 247. Based on the impracticality of requiring the aggrieved taxpayer at that stage to "assume the burden of seeking an increase of the taxes which . . . others should have paid," the Court held that petitioner was entitled to recover the overpayment.

The Establishment Clause case that comes most readily to mind as involving "underinclusion" is *Epperson* v. *Arkansas,* 393 U. S. 97 (1968). There the State prohibited the teaching of evolutionist theory but "did not seek to excise from the curricula of its schools and universities all discussion of the origin of man." 393 U. S., at 109. The Court held the Arkansas statute, which was framed as a prohibition, unconstitutional. Since the statute authorized no positive action, there was no occasion to consider the remedial problem. Cf. *Fowler* v. *Rhode Island,* 345 U. S. 67 (1953). Most of the other cases arising under the Establishment Clause have involved instances where the challenged legislation conferred a benefit on religious as well as secular institutions. See, *e. g., Walz* v. *Tax Comm'n, supra; Everson* v. *Board of Education, supra; Board of Education* v. *Allen, supra.* These cases, had they been decided differently, would still

This result, while tantamount to extending the statute, is not only the one mandated by the Constitution in this case but also the approach I would take had this question been presented in an action for a declaratory judg-

---

not have presented the remedial problem that arises in the instant case, for they were cases of alleged "overinclusion." The school prayer cases, *School District of Abington Township* v. *Schempp, supra;* and *Engel* v. *Vitale, supra;* and the released-time cases, *Zorach* v. *Clauson, supra; McCollum* v. *Board of Education, supra,* also failed to raise the remedial issue. In the school prayer situation the requested relief was an injunction against the saying of prayers. Moreover it is doubtful that there is any analogous secular ritual that could be performed so as to satisfy the neutrality requirement of the First Amendment and even then the practice of saying prayers in schools would still offend the principle of voluntarism that must be satisfied in First Amendment cases. See my separate opinion in *Walz* v. *Tax Comm'n, supra.* The same considerations prevented the issue from arising in the one released-time program case that held the practice unconstitutional.

In *McCollum*, where the Court held unconstitutional a program that permitted "religious teachers, employed by private religious groups . . . to come weekly into the school buildings during the regular hours set apart for secular teaching, and then and there for a period of thirty minutes substitute their religious teaching for the secular education provided under the compulsory education law," 333 U. S., at 205, the relief requested was an order to mandamus the authorities to discontinue the program. No question arose as to whether the program might have been saved by extending a similar privilege to other students who wished extracurricular instruction in, for example, atheistic or secular ethics and morals. Cf. my separate opinion in *Walz* v. *Tax Comm'n, supra.* Moreover as in the prayer cases, since the defect in the Illinois program was not the mere absence of neutrality but also the encroachment on "voluntarism," see *ibid.,* it is doubtful whether there existed any remedial alternative to voiding the entire program. A further complication would have arisen in these cases by virtue of the more limited discretion this Court enjoys to extend a policy for the States even as a constitutional remedy. Cf. *Skinner* v. *Oklahoma, supra; Morey* v. *Doud,* 354 U. S. 457 (1957); *Dorchy* v. *Kansas,* 264 U. S. 286 (1924).

ment or "an action in equity where the enforcement of a statute awaits the final determination of the court as to validity and scope." *Smith* v. *Cahoon,* 283 U. S., at 565.[16] While the necessary remedial operation, extension, is more analogous to a graft than amputation, I think the boundaries of permissible choice may properly be considered fixed by the legislative pronouncement on severability.

Indicative of the breadth of the judicial mandate in this regard is the broad severability clause, 65 Stat. 88, which provides that "[i]f any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby." While the absence of such a provision would not foreclose the exercise of discretion in determining whether a legislative policy should be repaired or abandoned, cf. *United States* v. *Jackson,* 390 U. S. 570, 585 n. 27 (1968), its existence "discloses an intention to make the Act divisible and creates a presumption that, eliminating invalid parts, the legislature would have been satisfied with what remained . . . ." *Champlin Rfg. Co.* v. *Commission,* 286 U. S. 210, 235 (1932). See also *Skinner*

---

[16] As long as the Selective Service continues to grant exemptions to religious conscientious objectors, individuals like petitioner are not required to submit to induction. This is tantamount to extending the present statute to cover those in petitioner's position. Alternatively the defect of underinclusion that renders this statute unconstitutional could be cured in a civil action by eliminating the exemption accorded to objectors whose beliefs are founded in religion. The choice between these two courses is not one for local draft boards nor is it one that should await civil litigation where the question could more appropriately be considered. Consequently I deem it proper to confront the issue here, even though, as a technical matter, no judgment could issue in this case ordering the Selective Service to refrain entirely from granting exemptions.

v. *Oklahoma, supra; Nat. Life Ins. Co.* v. *United States,*
277 U. S. 508 (1928).[17]

In exercising the broad discretion conferred by a sev-
erability clause it is, of course, necessary to measure the
intensity of commitment to the residual policy and con-
sider the degree of potential disruption of the statutory
scheme that would occur by extension as opposed to
abrogation. Cf. *Nat. Life Ins. Co.* v. *United States, supra*
(Brandeis, J., dissenting); *Dorchy* v. *Kansas,* 264 U. S.
286 (1924).

The policy of exempting religious conscientious ob-
jectors is one of longstanding tradition in this country
and accords recognition to what is, in a diverse and
"open" society, the important value of reconciling in-

---

[17] In *Skinner* the Court impliedly recognized the mandate of flex-
ibility to repair a defective statute—even by extension—conferred
by a broad severability clause. As already noted, the Court there
declined to exercise discretion, however, since absent a clear indi-
cation of legislative preference it was for the state courts to determine
the proper course.

While Mr. Justice Brandeis in a dissenting opinion in *Nat. Life
Ins. Co., supra,* at 522, 534–535, expressed the view that a sever-
ability clause in terms like that before us now is not intended
to authorize amendment by expanding the scope of legislation, his
remarks must be taken in the context of a dissent to a course
he deemed contrary to that Congress would have chosen. Thus,
after quoting *Hill* v. *Wallace,* 259 U. S. 44, 71 (1922), to the effect
that a severability clause "furnishes assurance to courts that they
may properly sustain separate sections or provisions of a partly
invalid act without hesitation or doubt as to whether they would
have been adopted, even if the legislature had been advised of the
invalidity of part [b]ut . . . does not give . . . power to amend the
act," Justice Brandeis observed, that: "Even if such a clause could
ever permit a court to enlarge the scope of a deduction allowed by a
taxing statute, . . . the asserted unconstitutionality can be cured
as readily by [excision] as by [enlargement]" and that the former
would most likely have been the congressional preference in that par-
ticular case. Cf. *Iowa-Des Moines National Bank* v. *Bennett, supra.*

dividuality of belief with practical exigencies whenever possible. See *Girouard* v. *United States,* 328 U. S. 61 (1946). It dates back to colonial times and has been perpetuated in state and federal conscription statutes. See Mr. Justice Cardozo's separate opinion in *Hamilton* v. *Board of Regents,* 293 U. S., at 267; *Macintosh* v. *United States,* 42 F. 2d 845, 847 (1930). That it has been phrased in religious terms reflects, I assume, the fact that ethics and morals, while the concern of secular philosophy, have traditionally been matters taught by organized religion and that for most individuals spiritual and ethical nourishment is derived from that source. It further reflects, I would suppose, the assumption that beliefs emanating from a religious source are probably held with great intensity.

When a policy has roots so deeply embedded in history, there is a compelling reason for a court to hazard the necessary statutory repairs if they can be made within the administrative framework of the statute and without impairing other legislative goals, even though they entail, not simply eliminating an offending section, but rather building upon it.[18] Thus I am prepared to accept the prevailing opinion's conscientious objector test, not as a reflection of congressional statutory intent but as patch-

[18] I reach these conclusions notwithstanding the admonition in *United States* v. *Reese* that it "is no part of [this Court's] duty" "[t]o limit [a] statute in [such a way as] to make a new law, [rather than] enforce an old one." 92 U. S. 214, 221 (1876). See also *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500 (1926); *Marchetti* v. *United States,* 390 U. S. 39, 60 (1968). Neither of these cases involved statutes evincing a congressional intent to confer a benefit on a particular group, thus requiring the frustration of third-party beneficiary legislation when the acts were held invalid. Moreover, the saving construction in *Marchetti* would have thwarted, not complemented, the primary purpose of the statute by introducing practical difficulties into that enforcement of state gambling laws that the statute was designed to further.

.

work of judicial making that cures the defect of under-inclusion in § 6 (j) and can be administered by local boards in the usual course of business.[19]  Like the prevailing opinion, I also conclude that petitioner's beliefs are held with the required intensity and consequently vote to reverse the judgment of conviction.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, dissenting.

Whether or not *United States* v. *Seeger*, 380 U. S. 163 (1965), accurately reflected the intent of Congress in providing draft exemptions for religious conscientious objectors to war, I cannot join today's construction of § 6 (j) extending draft exemption to those who disclaim religious objections to war and whose views about war represent a purely personal code arising not from religious training and belief as the statute requires but from readings in philosophy, history, and sociology.  Our obli-

---

[19] During World War I when the exemption was granted to members or affiliates of "well-recognized religious sect[s]" the Selective Service System found it impracticable to compile a list of "recognized" sects and left the matter to the discretion of the local boards.  Second Report of the Provost Marshal General to the Secretary of War on the Operations of the Selective Service System to December 20, 1918, p. 56.  As a result, some boards treated religious and nonreligious objectors in the same manner.  Report of the Provost Marshal General to the Secretary of War on the First Draft Under the Selective-Service Act, 1917, p. 59.  Finally, by presidential regulation dated March 20, 1918, it was ordered that conscientious objector status be open to all conscientious objectors without regard to any religious qualification.  The experience during World War II, when draft boards were operating under the broad definition of religion in *United States* v. *Kauten*, 133 F. 2d 703 (C. A. 2d Cir. 1943), also demonstrates the administrative viability of today's test.  Not only would the test announced today seem manageable but it would appear easier than the arcane inquiry required to determine whether beliefs are religious or secular in nature.

gation in statutory construction cases is to enforce the will of Congress, not our own; and as MR. JUSTICE HARLAN has demonstrated, construing § 6 (j) to include Welsh exempts from the draft a class of persons to whom Congress has expressly denied an exemption.

For me that conclusion should end this case. Even if Welsh is quite right in asserting that exempting religious believers is an establishment of religion forbidden by the First Amendment, he nevertheless remains one of those persons whom Congress took pains not to relieve from military duty. Whether or not § 6 (j) is constitutional, Welsh had no First Amendment excuse for refusing to report for induction. If it is contrary to the express will of Congress to exempt Welsh, as I think it is, then there is no warrant for saving the religious exemption and the statute by redrafting it in this Court to include Welsh and all others like him.

If the Constitution expressly provided that aliens should not be exempt from the draft, but Congress purported to exempt them and no others, Welsh, a citizen, could hardly qualify for exemption by demonstrating that exempting aliens is unconstitutional. By the same token, if the Constitution prohibits Congress from exempting religious believers, but Congress exempts them anyway, why should the invalidity of the exemption create a draft immunity for Welsh? Surely not just because he would otherwise go without a remedy along with all those others not qualifying for exemption under the statute. And not as a reward for seeking a declaration of the invalidity of § 6 (j); for as long as Welsh is among those from whom Congress expressly withheld the exemption, he has no standing to raise the establishment issue even if § 6 (j) would present no First Amendment problems if it had included Welsh and others like him. "[O]ne to whom application of a statute is constitutional will not be heard to attack the

statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States* v. *Raines,* 362 U. S. 17, 21 (1960). Nothing in the First Amendment prohibits drafting Welsh and other nonreligious objectors to war. Saving § 6 (j) by extending it to include Welsh cannot be done in the name of a presumed congressional will but only by the Court's taking upon itself the power to make draft-exemption policy.

If I am wrong in thinking that Welsh cannot benefit from invalidation of § 6 (j) on Establishment Clause grounds, I would nevertheless affirm his conviction; for I cannot hold that Congress violated the Clause in exempting from the draft all those who oppose war by reason of religious training and belief. In exempting religious conscientious objectors, Congress was making one of two judgments, perhaps both. First, § 6 (j) may represent a purely practical judgment that religious objectors, however admirable, would be of no more use in combat than many others unqualified for military service. Exemption was not extended to them to further religious belief or practice but to limit military service to those who were prepared to undertake the fighting that the armed services have to do. On this basis, the exemption has neither the primary purpose nor the effect of furthering religion. As Mr. Justice Frankfurter, joined by MR. JUSTICE HARLAN, said in a separate opinion in the *Sunday Closing Law Cases,* 366 U. S. 420, 468 (1961), an establishment contention "can prevail only if the absence of any substantial legislative purpose other than a religious one is made to appear. See *Selective Draft Law Cases,* 245 U. S. 366."

Second, Congress may have granted the exemption because otherwise religious objectors would be forced into conduct that their religions forbid and because

in the view of Congress to deny the exemption would violate the Free Exercise Clause or at least raise grave problems in this respect. True, this Court has more than once stated its unwillingness to construe the First Amendment, standing alone, as requiring draft exemptions for religious believers. *Hamilton* v. *Board of Regents,* 293 U. S. 245, 263–264 (1934); *United States* v. *Macintosh,* 283 U. S. 605, 623–624 (1931). But this Court is not alone in being obliged to construe the Constitution in the course of its work; nor does it even approach having a monopoly on the wisdom and insight appropriate to the task. Legislative exemptions for those with religious convictions against war date from colonial days. As Chief Justice Hughes explained in his dissent in *United States* v. *Macintosh, supra,* at 633, the importance of giving immunity to those having conscientious scruples against bearing arms has consistently been emphasized in debates in Congress and such draft exemptions are " 'indicative of the actual operation of the principles of the Constitution.' " However this Court might construe the First Amendment, Congress has regularly steered clear of free exercise problems by granting exemptions to those who conscientiously oppose war on religious grounds.

If there were no statutory exemption for religious objectors to war and failure to provide it was held by this Court to impair the free exercise of religion contrary to the First Amendment, an exemption reflecting this constitutional command would be no more an establishment of religion than the exemption required for Sabbatarians in *Sherbert* v. *Verner,* 374 U. S. 398 (1963), or the exemption from the flat tax on book sellers held required for evangelists, *Follett* v. *McCormick,* 321 U. S. 573 (1944). Surely a statutory exemption for religionists required by the Free Exercise Clause is not an invalid establishment because it fails to include nonreligious believers as well; nor would it be any less an establish-

ment if camouflaged by granting additional exemptions for nonreligious, but "moral" objectors to war.

On the assumption, however, that the Free Exercise Clause of the First Amendment does not by its own force require exempting devout objectors from military service, it does not follow that § 6 (j) is a law respecting an establishment of religion within the meaning of the First Amendment. It is very likely that § 6 (j) is a recognition by Congress of free exercise values and its view of desirable or required policy in implementing the Free Exercise Clause. That judgment is entitled to respect. Congress has the power "To raise and support Armies" and "To make all Laws which shall be necessary and proper for carrying into Execution" that power. Art. I, § 8. The power to raise armies must be exercised consistently with the First Amendment which, among other things, forbids laws prohibiting the free exercise of religion. It is surely essential therefore—surely "necessary and proper"—in enacting laws for the raising of armies to take account of the First Amendment and to avoid possible violations of the Free Exercise Clause. If this was the course Congress took, then just as in *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), where we accepted the judgment of Congress as to what legislation was appropriate to enforce the Equal Protection Clause of the Fourteenth Amendment, here we should respect congressional judgment accommodating the Free Exercise Clause and the power to raise armies. This involves no surrender of the Court's function as ultimate arbiter in disputes over interpretation of the Constitution. But it was enough in *Katzenbach* "to perceive a basis upon which the Congress might resolve the conflict as it did," 384 U. S., at 653, and plainly in the case before us there is an arguable basis for § 6 (j) in the Free Exercise Clause since, without the exemption, the law would compel some members of the public to engage in combat

operations contrary to their religious convictions, Indeed, one federal court has recently held that to draft a man for combat service contrary to his conscientious beliefs would violate the First Amendment. *United States* v. *Sisson*, 297 F. Supp. 902 (1969). There being substantial roots in the Free Exercise Clause for § 6 (j) I would not frustrate congressional will by construing the Establishment Clause to condition the exemption for religionists upon extending the exemption also to those who object to war on nonreligious grounds.

We have said that neither support nor hostility, but neutrality, is the goal of the religion clauses of the First Amendment. "Neutrality," however, is not self-defining. If it is "favoritism" and not "neutrality" to exempt religious believers from the draft, is it "neutrality" and not "inhibition" of religion to compel religious believers to fight when they have special reasons for not doing so, reasons to which the Constitution gives particular recognition? It cannot be ignored that the First Amendment itself contains a religious classification. The Amendment protects belief and speech, but as a general proposition, the free speech provisions stop short of immunizing conduct from official regulation. The Free Exercise Clause, however, has a deeper cut: it protects conduct as well as religious belief and speech. "[I]t safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell* v. *Connecticut*, 310 U. S. 296, 303–304 (1940). Although socially harmful acts may as a rule be banned despite the Free Exercise Clause even where religiously motivated, there is an area of conduct that cannot be forbidden to religious practitioners but that may be forbidden to others. See *United States* v. *Ballard*, 322 U. S. 78 (1944); *Follett* v.

*McCormick,* 321 U. S. 573 (1944). We should thus not labor to find a violation of the Establishment Clause when free exercise values prompt Congress to relieve religious believers from the burdens of the law at least in those instances where the law is not merely prohibitory but commands the performance of military duties that are forbidden by a man's religion.

In *Braunfeld* v. *Brown,* 366 U. S. 599 (1961), and *Gallagher* v. *Crown Kosher Market,* 366 U. S. 617 (1961), a majority of the Court rejected claims that Sunday closing laws placed unacceptable burdens on Sabbatarians' religious observances. It was not suggested, however, that the Sunday closing laws in 21 States exempting Sabbatarians and others violated the Establishment Clause because no provision was made for others who claimed nonreligious reasons for not working on some particular day of the week. Nor was it intimated in *Zorach* v. *Clauson,* 343 U. S. 306 (1952), that the no-establishment holding might be infirm because only those pursuing religious studies for designated periods were released from the public school routine; neither was it hinted that a public school's refusal to institute a released-time program would violate the Free Exercise Clause. The Court in *Sherbert* v. *Verner, supra,* construed the Free Exercise Clause to require special treatment for Sabbatarians under the State's unemployment compensation law. But the State could deal specially with Sabbatarians whether the Free Exercise Clause required it or not, for as Mr. Justice Harlan then said—and I agreed with him—the Establishment Clause would not forbid an exemption for Sabbatarians who otherwise could not qualify for unemployment benefits.

The Establishment Clause as construed by this Court unquestionably has independent significance; its function is not wholly auxiliary to the Free Exercise Clause. It bans some involvements of the State with religion that

otherwise might be consistent with the Free Exercise Clause. But when in the rationally based judgment of Congress free exercise of religion calls for shielding religious objectors from compulsory combat duty, I am reluctant to frustrate the legislative will by striking down the statutory exemption because it does not also reach those to whom the Free Exercise Clause offers no protection whatsoever.

I would affirm the judgment below.