**Richard A. MILLER, III, Plaintiff,**

v.

**The Honorable John F. CHAFEE et al.,
Defendants.**

**Civ. No. 71-3305.**

United States District Court,
D. Hawaii.

Feb. 26, 1971.

David C. Schutter, Honolulu, Hawaii, for plaintiff.

Robert K. Fukuda, U. S. Dist. Atty., by Joseph Gedan, Asst. U. S. Atty., for defendants.

TAVARES, District Judge.

The Constitution of the United States, Article I, Section 8, provides that the Congress shall have power "to raise and support Armies"; and to "provide and maintain a Navy." Article 2, Section 2 provides that "the President shall be Commander-in-Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; * * *." Without attempting to trace the historical evolutions, the

powers to raise and maintain Armed Forces have been exercised to some degree almost continuously since the founding of this nation. Compulsion to serve in the Armed Forces has existed in some form whenever necessity dictated. Probably the largest conscription of manpower came into being in connection with the crises which beset the Nation during World War II. Currently the broad powers granted to Congress and to the President are being exercised under the "Military Selective Service Act of 1967." 50 App. U.S.C. § 451 et seq. as amended. Exemptions for those who are "conscientiously opposed" to participation in war appear under 50 App. U.S.C. § 456(j).

The express language of this latter section has been the subject of a considerable amount of interpretation. Suffice it to say that the courts have been flooded and inundated by the rash of objectors. The foundations of the Selective Service System have eroded as though built on quick-sand.

Under the provisions of 50 App. U.S.C. § 456(h) (1) Congress provided that "Except as otherwise provided in this paragraph, the President shall, under such rules and regulations as he may prescribe, provide for the deferment from training and service in the Armed Forces of persons satisfactorily pursuing a full-time course of instruction at a college, university, or similar institution of learning and who request such deferment * * *."

In such a setting, nothing could be more natural than that those who sought to evade military service would and have sought haven, within the hallowed halls of the institutions of higher learning. The seekers of haven also found comradery among kindred souls. Many become so thoroughly imbued with their rationalizations as to seek faculty positions. In such an environment it is little wonder that an aurora of sophistication illumed a pathway for more to follow and upon which even the unwary seeking the light of learning would readily tread. Books have been written and courses created. To question any achievement of higher education may be almost as unheard of as to challenge the institution of motherhood, but this Court will brave that somewhat.

Exhibit "C" attached to the Petition herein is the finest, most thorough and complete, first hand account, which has come to this Court's attention, of the step-by-step havoc wrought upon a particular student by a pseudo-intellectual environment. The petitioner's biographical summation is replete with the names of his associates and instructors, together with publications which contributed to his thinking processes. It is also replete with terminology of the day and the jargon of the activists. The self-analysis contained therein is something like what the medical doctor does who would diagnose his own ills and prescribe the cure therefor, or, the lawyer who serves as his own attorney. It is ironical in this instance that the United States Government bought and paid for the so-called "education" to which the petitioner was exposed. The exhibit, in and of itself, is a thoroughly documented exposé of the subtle subversions of thought to which this particular young man was subjected. It may be reasonable to assume that it may be typical of a pattern and may offer some explanation as to why so many young people succumb to the thoughts and teachings of the self-proclaimed intellectuals of our day.

A school-oriented education has been described as a "short-cut to experience but by no means a substitute." Another approach dictates that education teaches an abundance of basic facts to which abstract thought may be applied. A child learns to walk, run, jump and swim, but merely learning to do these things is quite different from excelling in the sports of Olympic Competition wherein such accomplishments are put to their highest and best use. For a young man just completing his under-graduate work to come to a belief that he has found all of the answers so soon after having learned to think, is, it seems to me, unfortunate. One can only wonder if this

same mistake does not guide the activity of other collegiate activists. When instructors and faculty members join the sundry demonstrations and movements, it may be that they, too, suffer from a sort of mental adolescence, but their influence is no less effective.

Max Lerner, in a recent syndicated column, points out that the U. S. Census figures show the number of college students in the United States grew from 4.6 to 7.4 million during the last half of the 1960's.

We can quite reasonably deduce that the content of Exhibit "C" provides some insight into draft evasion, conscientious objection and peace at any price. The same environment probably spawns snarling violence, the seizure of, or destruction of buildings, hatred of police, revolt toward the Establishment, the drug scene, parental resentment, a loathing for law and order and uproar in the court rooms.

In this case the petitioner recites a childhood of frequent beatings. He relates that he was the frequent and primary target for the intoxicated wrath of an alcoholic father. He enlisted in the Navy at the age of 17 and served for a period of five years. He served in submarines and from what is shown in the record, made rather exceptional progress. He was selected to attend college under the NESEP Program and obtained a degree in Mechanical Engineering from the University of Washington. Although the record does not specifically establish the petitioner's obligation to serve the Navy, it is believed that the individual obligates himself to serve about nine months for each six-months of schooling, which the Navy provides to him. After completing college, this young man attended and completed Officer's Candidate School and was commissioned an Ensign in the United States Navy.

An in-service engineering course was then attended and completed. Almost immediately after reporting for his first post-school duty as an officer, Ensign Miller began to compile a record to place before the Bureau of Naval Personnel, seeking discharge from the United States Navy as a conscientious objector, under BUPERS NOTE 1900 promulgated on August 21, 1970, which authorized release for beliefs based on nonreligious grounds. The NOTE was undoubtedly designed by the Navy to Accommodate the decision of the United States Supreme Court in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

From the record presented, it is apparent that the petitioner has exhausted the administrative remedies available to him in the Navy. In this connection, I cite, Craycroft v. Farrell, 397 U.S. 335, 25 L.Ed.2d 351, 90 S.Ct. 1152.

This Court does not intend to trace the evolution of Conscientious Objector cases which are so legion in the reported cases. Suffice it to say that administrative agency determinations will only be overturned when no basis in fact can be found to sustain the determination. Among other cases, I cite Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955), and United States v. Newton, 435 F.2d 671, a 9th Circuit case decided the 15th of December, 1970.

If there is any rational distinction between the pre-induction case and the in-service case, this Court fails to perceive what it is. Congress established the ground rules whereby the pre-induction claim would constitute an exemption. The cases have picked at minutia and almost every conceivable facet of the subject has been explored by the courts. The courts have decided that a conscientious objection may well arise after a man has entered upon military duty and that the same basic standards of exemption should be applied to him. The services have promulgated regulations to facilitate and implement the edicts of the courts.

After reviewing the cases and applying what the Court of Appeals for the Ninth Circuit has labelled as the "narrow basis in fact" test, this Court is left with a firm conviction that irrespective of how the courts are enunciating the principles to be applied or the terminology

used in expressing their views, they are saying in essence, "if a man expresses a sincere desire to be separated from the service and predicates his request upon a conscientious opposition to participation in war, he should be discharged."

The Ninth Circuit in the Newton case, supra, noted:

"Not a single objective fact or observation is recorded in the Justice Department's letter which lends credence to a conclusion of insincerity based on Newton's demeanor. * * * "

The Appellate Court quite clearly was casting the burden of sustaining the recommendation for classification upon the Selective Service Board. The Court says at page 674:

"Under the holding of this Court in United States v. French, 429 F.2d 391 (9th Cir. 1970), if the recommendation for classification from the Justice Department to the Board contains even one impermissible ground upon which the Board may have relied, the classification is without basis in fact."

This Court simply says in passing, that to require an enumeration of objective facts to establish and to prove subjective thought is indeed difficult if not a practical impossibility in most cases. This one is no different.

Here, as in a typical case, the application for discharge was a monumental undertaking. Even if the petitioner devoted only off-duty time to its preparation, it is reasonable to believe he probably thought a great deal about it during duty hours also. It has been of paramount importance in his mind. The various interviews were conducted during normal working hours. The manpower expended in the preparation of endorsements has been enormous. It seems rather obvious to this Court, however, that the petitioner is and will be of no appreciable usefulness to the Navy, henceforth, so why belabor the matter further. In Judicial channels, untold further hours will be expended.

The Court must take this opportunity to note, as did the Assistant Chief for Performance (Pers.–F–23–wjw, Ser. F2/63 of 27 January 1971) that the petitioner received 299 weeks or a cumulative five years and nine months of formal school training during his nine years and two months of service; that he acquired his conscientious objections while attending school at Government expense, and that despite any reservations he may have entertained, he continued to accept his pay and allowances, and allowed the Department of Defense to pay his tuition; that his anti-military beliefs did not come forward as a motivating factor to bar his continued participation as an active military member so long as he was receiving benefits and was not being required to execute his contractual obligation of repayment which had accrued.

This Court does not have before it, except inferentially, the details of the contractual obligations which the petitioner assumed, incident to his educational program, but recognizes from petitioner's own submission that he did undertake contractual obligations.

The Court declines, upon the showing made to issue a *writ of habeas corpus*, or to grant injunctive or other relief at the moment. Being a Court of Equity, however, the Court will order that the petitioner be discharged as a conscientious objector in accordance with appropriate directives upon a showing, seasonably made by him to this Court, that he has made some satisfactory arrangement with the Government of the United States to compensate or reimburse the Government for his failure to perform his contractual obligations to the Navy. The Court at this juncture offers no opinion as to what might be an appropriate measure of damages. Failure to seasonably resolve what in effect amounts to a unilateral anticipatory breach of contract problem, will cause the Court in all probability to order that the petitioner be discharged because it would not be equitable or just to cause the Navy to incur further damages by continuing pay and allowances to the peti-

tioner after he has announced his intentions to breach his side of the agreement. At the same time and in accordance with the law, as understood by the Court, the petitioner will not be placed in the position where he will be subjected to disciplinary proceedings for refusal or failure to perform his duties. In the event that the Court reaches that point at which a discharge is directed, the Court would hope that the Government will be in a position to bring a civil claim against the petitioner seeking damages for his breach of contract.

The Court is temporarily attempting to maintain a status quo pending a more satisfactory solution. In so doing, the Court is recognizing the possible First Amendment rights claimed by the petitioner, and also the contractual obligations freely assumed by him, and by which he may very well have effectively waived certain of his rights even if granted constitutional standing. As the Court views the matter, perhaps preliminarily, whatever rights the petitioner seeks to assert may actually lean more heavily toward being privileges extended to in-service personnel by the Department of Defense than to being constitutionally guaranteed rights.

Now in this connection, because I say I will not issue the order at this time, I would ask if the Government will assure the Court that no punitive action will be taken against this petitioner, pending the further resolve of this Court. I realize that this is a new departure. In the past we have been just letting everybody go, no matter how much he had gotten out of the Government, whenever he was held to be a Conscientious Objector.

The Court thinks it is about time the Government began to be considered as having some equities in the matter also as a *quid pro quo;* and who knows, the higher courts, if they accept this, perhaps will judicially legislate another *Miranda* decision that from now on this rule will apply, but not before.

As I see it, too many people are getting away with too much, and I think it's about time they starting thinking about reimbursing the Government which has paid for that education, once they decide not to go through with the contract.