**Pvt. II Henry Grant THOMAS, Jr.**

v.

**Ltc. Peter B. SALATICH, Jr., as Commanding Officer of 337th USAR Medical Detachment (Dental Service); and**

**Stanley Resor, as Secretary of the Army.**

**Civ. A. No. 71–508.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

June 8, 1971.

2. Defendant also cites 70 C.J.S. Payment § 133, p. 341 and § 134, p. 343 to the same effect.

Pres Kabacoff, New Orleans, La., for plaintiff.

James Carriere, Asst. U. S. Atty., New Orleans, La., for defendants.

COMISKEY, District Judge.

### MEMORANDUM OF REASONS

This is a petition for writ of habeas corpus by Private Henry Grant Thomas, Jr., whose application for discharge from the United States Army as a conscientious objector was denied by the Army Conscientious Objector Review Board. We hold that the petition should be granted for the reason that the decision of the Board is unsupported by any basis in fact within the meaning of the recent jurisprudence.

On January 7, 1970, petitioner enlisted in the United States Army and joined an Army reserves dental unit. On July 27, 1970, he wrote a letter to his commanding officer, Lieutenant Colonel Peter B. Salatich, in which he informed this offi-

cer of his decision to request discharge from the Army as a conscientious objector. Thereafter the petitioner was interviewed by the Commanding Officer of the Judge Advocate General Detachment and petitioner's discharge was recommended as a conscientious objector. Petitioner was likewise interviewed by a psychiatrist who opined that the petitioner would function ineffectively within the military setting, and the interview of the petitioner by the chaplain concluded that the petitioner would be a "detriment to the Army and the morale of the troops with whom he would serve". Accordingly, petitioner's own commanding officer recommended approval of petitioner's request for discharge. However, his request was denied by the Army Conscientious Objector Review Board on November 19, 1970, and thereafter his petition for writ of habeas corpus was filed in this Court. Trial on the merits of this case was held and the matter was taken under submission at that time.

■ This Court's jurisdiction is not seriously contested by the Government. However, we must touch on the jurisdictional issue, because neither party can waive jurisdiction defects. Pitcher v. Laird, 421 F.2d 1272, 1276 (5th Cir. 1970); United States ex rel. Healy v. Beatty, 424 F.2d 299, 301 (5th Cir. 1970). But even though we must rule on the issue of jurisdiction, we need not dwell upon this point. For it is now settled in this circuit that United States District Courts do have jurisdiction to entertain habeas corpus petitions of the type asserted in this case. It is not necessary that petitioner exhaust his administrative remedies by appealing the denial of his application for discharge to the Board of Correction of Military Records. Pitcher v. Laird, *supra*, 421 F.2d at 1276–1277; United States ex rel. Healy v. Beatty, *supra*, 424 F.2d at 301. See also Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968); United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969).

The Army Conscientious Objector Review Board rejected petitioner's request for discharge for the following reasons:

"The Board unanimously believed that PV2 Thomas' alleged conscientious objector beliefs are not truly held; are not grounded in religious training and belief (to include strongly held moral and ethical convictions); and any objection to war in any form he might truly hold is based solely on consideration of policy, expediency, pragmatism, and views held prior to petitioner's enlistment." [1]

All of the above reasons, with the exception of the last ground (views held prior to enlistment) are based on Section 6(j) of the Military Selective Service Act of 1967, 50 U.S.C. App. § 456(j), which provides in part:

"Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code."

■ The first reason based on Section 6(j) which was given by the Board was its assertion that the petitioner's views are not "truly held". This means that regardless of the truth or falsity of the beliefs themselves, the petitioner is not sincere when he professes to hold them. Thus, in United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 853, 13 L.Ed. 2d 733, 747 (1965), the Supreme Court said:

"But we hasten to emphasize that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every

1. Army Conscientious Objector Review Board Record of Proceedings at 2.

case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector."

In order to decide this point, we must review the Board's factual determination. It is therefore necessary to consider the scope of review applicable to this case: "[O]ur scope of review is identical to review of conscientious objector claims presented to local draft boards prior to induction: whether there is any basis in fact for the finding that an individual has not presented a valid conscientious objector claim." Pitcher v. Laird, 421 F.2d 1272, 1278 (5th Cir. 1970). However, a conscientious objector claim presents special problems. Here, the Board and the courts must look to the personal beliefs of the claimant, who asserts his views when he makes his request for discharge before the Board. "Therefore, in this case—indeed, as in all conscientious objector cases—the threshold question for review is the sincerity of the claimant in objecting, on religious grounds, to participation in war in any form. Sincerity of course is a subjective question." Helwick v. Laird, 438 F.2d 959, 963 (5th Cir. 1971). But the Board may not arbitrarily disbelieve the applicant. Rather, "[t]here must be some facts in his application—hard, provable, reliable facts—that provide a basis for disbelieving the claimant." Ibid. In Kessler v. United States, 406 F.2d 151, 156 (5th Cir. 1969), the court said:

"To be precise about it, the disbelief of Selective Service officials will not justify the rejection of a claim for conscientious objector status unless there is some affirmative evidence to support the rejection of the claimed exemption or there is something in the record which substantially (emphasis added) blurs the picture painted by the registrant and thus casts doubt on his sincerity, Batterton v. United States, 8 Cir., 1958, 260 F.2d 233."

The Board's other reasons based on Section 6(j) deal with the term "religious training and belief" as it is used in the statute. This term has been ex-plained by the Supreme Court in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), and Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). Under these cases it is not necessary that the beliefs in question be religious in the sense that they are based on belief in a deity or on the doctrines of a particular religion. Rather, in order for a person's conscientious objection to war to be "religious", his objection must be based on an ethical or moral belief which is so strong and so deeply and sincerely held that it "occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption * * *." United States v. Seeger, supra, 380 U.S. at 176, 85 S.Ct. at 859, 13 L.Ed.2d at 743. The objection to war must "stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and * * * these beliefs [must] be held with the strength of traditional religious convictions." Welsh v. United States, supra, 398 U.S. at 340, 90 S.Ct. at 1796, 26 L.Ed.2d at 319. It is sufficient that "an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time * * *." Ibid. In Welsh the Supreme Court also dealt with Section 6(j)'s statement that "As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code." First, the Court said that this sentence should not be read "to exclude those who hold strong beliefs about our domestic and foreign affairs or even those whose conscientious objection to participation in all wars is founded to a substantial extent upon considerations of public policy." 398 U.S. at 342, 90 S.Ct. at 1798, 26 L.Ed.2d at 320. Rather, said the Court, "The two groups of registrants that obviously do fall within these exclusions from the exemption are those whose beliefs are not deeply held

and those whose objection to war does not rest at all upon moral, ethical, or religious principle but instead rests solely upon considerations of policy, pragmatism, or expediency." 398 U.S. at 342–343, 90 S.Ct. at 1798, 26 L.Ed.2d at 320.

■ So in summary we may say that a person's moral and ethical beliefs are "religious" within the meaning of Section 6(j) if they are so deeply held that they are held with the strength of religious convictions. Such beliefs may be founded to a substantial extent upon considerations of public policy. However, an objection to war is not religious if it is not deeply held or if it is based only upon considerations of policy, pragmatism or expediency rather than upon moral, ethical or religious principles.

In light of the above definitions taken from *Welsh* and *Seeger,* it can now be seen that the Board's holding under Section 6(j) can be broken down into two basic grounds: (1) the petitioner's beliefs were not *truly* held, and (2) the petitioner's beliefs were not *deeply* held, that is, they were not held with the strength of traditional religious convictions, or such beliefs were not based on moral, ethical or religious grounds. These concepts begin to merge when we consider the Board's holding and the evidence which was before the Board. This is because the Board's reasons for finding that the petitioner's beliefs were not *truly* (or sincerely) held may also be used to show that even if he was sincere in asserting these views, nevertheless, he does not hold them *deeply* enough so that it can be said that he holds them with the strength of traditional religious convictions. With this in mind, we now proceed to review the Board's rejection of petitioner's request for discharge for reasons based on Section 6(j) of the Military Selective Service Act of 1967.

It is now necessary to examine the petitioner's professed beliefs, which are out-lined in a fifteen-page essay that formed part of his request for discharge and which has been made part of this record. According to this essay, petitioner was brought up in the Episcopalian Church. There he "was introduced to the basic Christian ethic of love, faith, and charity, and to the tenet that one should do unto others as he would have them do unto him." [2] But his experience with the Church also revealed to him "the disparity which too often exists between Christian theory and actual practice." [3] For he learned that many members of the Church were theoretically committed to the Christian ideal of love but often seemed to violate that ideal in everyday life. At the same time, while attending high school and college, petitioner was influenced by teachers and authors who "stressed the importance of individual moral responsibility and exposed the disastrous physical and psychological consequences of intolerance, violence, and war." [4] Among the authors whose works influenced petitioner were Henry David Thoreau, Ernest Hemingway, Mark Twain, Albert Camus and John Paul Sartre.

At the time he presented his request for discharge to the Army Conscientious Objector Review Board petitioner had ceased to be an active member of the Episcopalian Church. Rather, he now believes that "piety is not a necessary precondition of virtue, that one need not believe in God to believe in what is right and good. God is, after all, essentially a symbol or apotheosis of what is best in man * * *." [5] Petitioner veers away from believing in the doctrines of any particular religion, because in his opinion, belief in a particular deity can lead to intolerance and persecutions. As examples of such "vindictive dogmatism" [6] petitioner lists the Spanish Inquisition and the Salem witch trials. For this reason, petitioner "prefer[s] to define

---

2. Petitioner's essay written in support of his application for discharge at 6.

3. *Ibid.*

4. *Ibid.*

5. *Id.* at 1.

6. *Ibid.*

[his] religion in terms of universal love rather than in terms of a particular deity." [7] Petitioner quotes with approval a statement defining religion as "the devotion of man to the highest ideal that he can conceive." [8] For petitioner, this ideal is love. But petitioner's conception of love is not limited to love of others. Rather, he places the greatest emphasis on self-love, "for one cannot truly love others unless he first loves himself * *. [T]o love another without first loving oneself is adulation at best, servile fawning dependency at worst." [9] Petitioner goes on to say that it is impossible to truly love oneself without first having self-respect, "for love without respect is merely affection." [10] In order for one to have self-respect, he must decide what his values are and where his moral responsibilities lie and act according to such values and responsibilities. In short, in order to have self-respect, one must be morally answerable to himself. And this is one reason why petitioner feels that he can no longer serve in the military: "for while the military does demand obedience to a 'higher authority,' it fails to recognize that there is no higher authority than the self. In failing to do so, it can and does turn soldiers into automatons * * *. [I]t turns its members into 'wooden men' * * * it deprives (or relieves) them of individual moral responsibility for their actions * * * it substitutes respect for authority for self-respect." [11]

Petitioner is also opposed to the military because it represents "the belief that violence (or the threat of violence) is the ultimate persuader." [12] Petitioner's beliefs are exactly opposite. He has concluded that the violence perpetrated in war is immoral. He also believes that the violence of war is stupid, "for it is evidence of failure to find an intelligent, rational, and peaceful way to resolve differences." [13] Furthermore, war is futile, because it cannot persuade the opponent. "It can coerce, intimidate, and destroy, but it can never really persuade. The only moral and intelligent way in which others can really be persuaded, in which differences can really be resolved, is through love and respect." [14]

These, then are the views which the petitioner professes to hold. We will now consider the validity of the factual grounds upon which the Board based its holding that these views are neither truly held nor religious, that is, deeply held or based on moral or ethical beliefs.

■ In its written reasons the Board first cited several passages in the above essay and other items of evidence submitted before it which, in the Board's opinion, show that petitioner is opposed to the Vietnam War in particular. True, there is evidence that he does disapprove of the Vietnam War. But we do not see how this casts doubt upon his professed belief that all wars are immoral, in the absence of some evidence that he approves of wars other than the Vietnam conflict. It is logical, indeed axiomatic, that a person who opposes all wars must oppose a particular war. Thus, we do not see petitioner's opposition to the Vietnam War as a disqualifying factor any more than we would be of the opinion that he should be disqualified because he disapproves of World War II or the Spanish-American War or the Peloponnesian Wars. If he is opposed to war in general, it necessarily follows that he is opposed to any particular war, including the Vietnam War. The Fifth Circuit agreed with this reasoning in Kessler v. United States, 406 F.2d 151, 155 (5th Cir. 1969), when it said that "disapproval of war in Viet-Nam or any other place is certainly consistent, rather than inconsistent, with conscientious objection to armed conflict. Really, if Kessler had

---

7. *Ibid.*

8. *Id.* at 2. Source of quote in Ethics as a Religion by David Saville Muzzy.

9. *Id.* at 2.

10. *Ibid.*

11. *Id.* at 2–3.

12. *Id.* at 3.

13. *Ibid.*

14. *Id.* at 4.

said that he was a conscientious objector but nevertheless approved of any war this would have been such an inconsistency as to have undermined the sincerity of his religious objection to all wars." Our holding on this point is not at odds with Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), in which the Supreme Court held that Section 6(j) does not grant a conscientious objector exemption to those who conscientiously oppose participation only in a particular war. In the case at bar, we simply fail to see any evidence that the Vietnam War is the *only* war to which petitioner is opposed. Rather, our reading of his essay and the other items of evidence submitted to the Board lead us to the conclusion that it is very clear that petitioner opposes *all wars*, including the Vietnam War.

The Board next noted that petitioner said in his essay that he would use physical force to ward off an attacker. Petitioner did say that he would use force in the following situation: "If a person were to attack me or one of my loved ones without justification, I would be obligated to employ whatever force would be necessary to ward off that attack. It might so happen that physical force would be necessary; even if that were so, however, I would use only the amount of force appropriate to the situation, and would confine my response to the person involved." [15] But the willingness to use force in self-defense of oneself and one's family cannot serve as a basis for denial of a conscientious objector discharge. Sicurella v. United States, 348 U.S. 385, 389, 75 S.Ct. 403, 405, 99 L.Ed. 436 (1955); United States v. Davila, 429 F.2d 481, 483 (5th Cir. 1970); United States v. James, 417 F.2d 826, 831 (4th Cir. 1969); Miller v. Laird, 318 F.Supp. 1401, 1403 (N.D.Cal.1970). Therefore, petitioner's statement that he would use force in self-defense is not fatal to his claim.

The Board also says that some statements made by petitioner imply that he approves of the use of violence or force within moderation. There are several statements made by petitioner from which this inference might be drawn. For example, he criticizes the military for using excessive force, saying, "It may have been necessary to defeat Hitler, but it was not necessary to obliterate the civilian population of cities like Dresden. It may have been necessary to defeat Japan, but it was not necessary to destroy Hiroshima and Nagasaki." [16] Petitioner also appears to give at least a qualified approval to the force exerted by the police: "Police force, even though at times it is characterized by violence, is at least directed against only those who are guilty. Police force is at least preventive and appropriate, whereas military force is all too often punitive and excessive." [17] But it is the opinion of this Court that the petitioner's apparent condoning of force used in moderation does not supply a basis for disbelieving his assertion that he opposes war. The statute in question does not require that a conscientious objector oppose the use of force in all circumstances; rather, it states that he must be "conscientiously opposed to participation in war in any form." [18] In United States v. Purvis, 403 F.2d 555 (2d Cir. 1968), the Second Circuit was confronted with the same problem and reached the same conclusion. There, Purvis, the petitioner, was asked, "Under what circumstances, if any, do you believe in the use of force?" He answered, "I believe in the use of force only if it is used as the only alternative to restrain an individual from doing wrong, but not used to indiscriminately kill." 403 F.2d at 563. The Second Circuit held that this belief, which seems very similar to the petitioner's views in the case at bar, did not disqualify Purvis from being a conscientious objector:

"The statute providing exemption for conscientious objectors does not speak

15. *Id.* at 12.

16. *Id.* at 12–13.

17. *Id.* at 13.

18. Section 6(j) of the Military Selective Service Act of 1967, 50 U.S.C.App. § 456(j).

of objection to *force*, but rather of conscientious objection to 'participation in *war* in any form.' (Emphasis added.) Agreement that force can be used to restrain wrongdoing, especially as the last alternative, has little bearing on an attitude toward war. We would not expect a full-fledged conscientious objector to stand by while a madman sprayed Times Square with machine gun bullets, or while an assassin took aim at the President." *Ibid.*

█ As further evidence of petitioner's alleged insincerity, or of the fact that his objection to war is not based upon religious beliefs, the Board said that since petitioner's enlistment, he "has not made any sacrifices nor performed any actions giving evidence of his alleged beliefs." [19] Standing alone, we do not see how this fact *"substantially * * *" blurs the picture painted by"* the petitioner. Kessler v. United States, 406 F. 2d 151, 156 (5th Cir. 1969). In our opinion, the fact that a person has not actually suffered or made sacrifices because of his pacifist beliefs should not necessarily disqualify him as a conscientious objector under Section 6(j). Furthermore, it is not clear to us what actions petitioner could have taken besides his request for discharge which would have revealed his conscientious objector views. Surely, the Board could not mean that petitioner should have disobeyed orders or led peace marches during drills, or that he should have attempted to incite others to commit acts of disobedience. Surely, one does not have to be an activist or a troublemaker in order to be a conscientious objector.

The Board also said that "Petitioner has never expressed his alleged views on conscientious objection publicly or privately. The Board found his reference to 'several letters, much of my teaching, and many conversations' vague and inconclusive." [20] This reference is to a part of petitioner's essay in which he had to state whether he had ever given public expression to his conscientious objector views. Petitioner wrote in part, "Since I am not given to public oratory and have not published my written material, I cannot answer this question affirmatively. Of course, in several letters, much of my teaching, and many conversations, I have made my views known * * *." [21] We are of the opinion that the petitioner's reference to letters and conversations is not vague and inconclusive because there is evidence in his application of such conversations and letters. Thus, in a letter of recommendation written by Mrs. Barbara Laird and submitted to the Board, several of these conversations were recounted. Furthermore, Mrs. Laird even quoted from one of petitioner's letters, in which he clearly expressed his conscientious objector views. In another letter of recommendation, Professor John D. Husband mentioned a two-hour conversation about petitioner's decision to declare himself a conscientious objector. Another conversation of a similar nature is described in a letter of recommendation submitted by Emmett H. Fremaux, Jr. Still another conversation in which petitioner discussed his conscientious objector views is described in a letter of recommendation written by Congressman George Bush.

█ In view of the above considerations, we can find no basis in fact for the Board's holding that petitioner's beliefs are not truly held or that they are not grounded in religious training and belief within the meaning of Section 6(j) of the Military Selective Service Act of 1967, 50 U.S.C.App. § 456(j). We find no "hard, provable, reliable facts" in the record, Helwick v. Laird, 438 F.2d 959, 963 (5th Cir. 1971), which *"substantially * * * blurs the picture painted by* [petitioner] and thus casts doubt on his sincerity * * *."* Kessler v. United States, 406 F.2d 151, 156 (5th Cir. 1969).

19. Army Conscientious Objector Review Board Record of Proceedings at 3.

20. *Ibid.*

21. Petitioner's essay at 14.

■ The final reason asserted by the Board for refusing petitioner's request for discharge was that "any objection to war in any form he might truly hold is based solely on * * * views held prior to petitioner's enlistment." [22] This ground for refusal is not based on Section 6(j) of the Military Selective Service Act of 1967 but on Army Regulation 135–25. AR 135–25(5) (a) states in part:

"Consideration will be given to requests for discharge by reason of conscientious objection to participation in war, in any form, when such objection develops subsequent to the member's entry into military service * * *."

However, states AR 135–25(5) (b), "claims based on conscientious objection growing out of experiences prior to entering military service, but which did not become fixed until entry into the service, will be considered."

Before examining the reasons given by the Board for this finding, as well as the evidence which was presented before the Board, we must clarify one point. The Board worded its holding and reasons in support thereof in a way which indicated that the question which it had to decide was whether or not the petitioner's present religious beliefs (or "views") existed before his enlistment. This is not a correct statement of this legal issue. It is not the petitioner's *beliefs* or *views* which must develop only after entry into military service; rather, it is the *objection* to war in any form based on such belief that can become fixed only subsequent to enlistment. The belief *itself* may exist prior to the applicant's entry into the armed forces. In United States ex rel. Healy v. Beatty, 424 F.2d 299, 302 (5th Cir. 1970), which dealt with an Army Regulation exactly corresponding to AR 135–25,[23] the court said, "[T]here is nothing in the Statute, the Regulations or the decisional law which requires a substantial change in religious beliefs subsequent to [entry into military service] in order to present a valid claim for discharge on conscientious objector grounds." After examining the regulation before it, the court further concluded, "This does not mean that the religious belief upon which the objection is based must manifest itself only subsequent to entry on active duty but rather, the objection itself must so manifest itself and not exist prior to entry on active duty." *Ibid*. In Helwick v. Laird, 438 F.2d 959 (5th Cir. 1971), as in the case at bar, the Board had based its denial of discharge upon the finding that the applicant's religious *beliefs* existed before his enlistment in the Army.[24] The court briefly disposed of the question by assuming that the Board meant to find that the objection, rather than the religious belief, existed prior to entry into the service, and said:

"Under AR 635–20 [which exactly corresponds to AR 135–25] there is no requirement that the religious belief

---

22. Army Conscientious Objector Review Board Record of Proceedings at 2.

23. The Army Regulation at issue in the *Healy* case was AR 635–20, which has precisely the same wording as the portions of AR 135–25 which are relevant to the case at bar. Thus, AR 635–20(3) (a) is the same as AR 135–25(5) (a), and AR 635–20(3) (b) corresponds to AR 135–25(5) (b). The two Regulations are used in different situations, as is explained by AR 135–25(2):

"2. *Applicability*. a. This regulation applies to all Reserve members of the Army, except those specified in b below.

b. The provisions of AR 600–200, AR 614–106, and *AR 635–20* govern the disposition of Reserve members of the Army who claim to be conscientious objectors and who are either—

(1) Serving in the active military service in their Reserve status; or

(2) Serving on initial active duty for training in their status as Reserves of the Army." (Emphasis added.)

24. The court in *Helwick*, like the court in *Healy*, was faced with AR 635–20. It is quite understandable that the Board phrased its holding in terms of petitioner's "beliefs" or "views" rather than in terms of his "objection". The *Helwick* case, which dealt with the same error at some length, was not decided until after the Board's decision in the case at bar.

upon which objection is based must manifest itself only subsequent to entry into the service. Indeed, the claimant may properly hold the same or similar religious beliefs both before and after his entry into the service. Rather, the requirement of AR 635–20 (3) (b) [which exactly corresponds to AR 135–25(5) (b)] is that the objection itself—the objection to participation in war in any form—must become fixed only after entry into the Army. Although the Board has inartfully phrased it, we assume that it meant to find this latter fact—that Helwick's objection to participation in war in any form existed at the time he was granted a I–A–O classification and did not thereafter change." 438 F.2d at 966.[25]

We now examine the evidence presented before the Board on this issue. It is the petitioner's assertion that he has long held conscientious objector views but that prior to his enlistment in the United States Army these views were merely theoretical. Petitioner further claims that after he joined the Army, his views became active and strong. As petitioner wrote in his essay:

"I have long been a conscientious objector in theory. I have long studied, written, spoken, and taught about the values that are the basis of my claim. I have long been aware of the dehumanizing immorality and futility of war, and have long evinced many signs of my aversion to violence. I have avoided fights, forsworn hunting, supported peace candidates, questioned wars, and mourned their victims. I have taken part in peace marches, written my congressman, plastered my car with posters for peace. Only recently, however,

have I realized that this is not enough, that theory is one thing and practice another, that a truly conscientious objector must work for peace with more than just his mouth. I have realized, in other words, the difference between merely expressing an opinion and actually living a belief." [26]

How did this change come about? Again, according to petitioner's essay, at the time he joined the Army his "beliefs were so theoretical and weak that [he] was able to compromise them" [27] by joining an Army reserves medical unit, so that he could serve in a noncombatant capacity. But after joining, he had some experiences which allegedly altered his beliefs:

"Soon after I joined * * * I began to see ever more clearly the insupportable hypocrisy of my affiliation with the army. Many of my students, for example, greeted the news of my enlistment with scorn, cynicism, and disbelief, since what I had done was so much at variance with the ideals I had been teaching them. My experiences in the reserves heightened this sense of hyprocisy, of self-betrayal. Most of the reservists I encountered, myself included, seemed less concerned with serving their country in some constructive way than with marking time and staying out of Vietnam. Most regarded their military obligation not with an attitude of positive dedication, but with one of sarcastic dislike or forbearance." [28]

There is also evidence in the record that the 1970 invasion of Cambodia was a factor in bringing on the crystallization of petitioner's objection to war. In his

---

25. In both *Helwick* and *Healy*, the applicants had clearly shown pacifist or conscientious objector leanings before entry into the service by having sought and obtained I–A–O conscientious objector classifications prior to induction. Such a classification permitted both Helwick and Healy to serve in the armed forces but only in noncombatant capacities. See 32 C.F.R. § 1622.11. Thus, it

may be said that the petitioners in the *Helwick* and *Healy* cases had weaker arguments than the petitioner in the case at bar, who did not obtain such a classification prior to enlistment.

26. Petitioner's essay at 14.

27. *Id.* at 9.

28. *Ibid.*

letter of recommendation on petitioner's behalf Congressman George Bush wrote:

"Cambodia was, it now appears to me, a point of crystallization for Henry Grant Thomas' thinking. To him this seemed to be a personal crisis—a move so desperate that it pushed him across an imaginary line—a line that somehow had separated him from others who had long before recognized that they were conscientious objectors.

\* \* \* \* \* \*

" \* \* \* I am convinced that this move converted Henry Grant Thomas from a critic to a genuine conscientious objector. In my view, Cambodia made clear to him that he could no longer live with himself without publicly bespeaking his objection—without stepping across the line that separated his actions from his conscience." [29]

So now, after he has spent some time as a member of the Army reserves, petitioner claims that his objection to war has passed out of the quiet realm of theory and into the hard, bleak world of practice and actuality: "My own revulsion to the hideous, faceless mask of war has been theoretical long enough; I can make it actual only by severing all ties with the army." [30]

We are of the opinion that in the above statements petitioner has presented a prima facie claim that his objection to participation in war in any form became fixed only after he enlisted in the Army. He clearly asserted that although his basic pacifist beliefs remained more or less unchanged, it was only after his entry into the military service that his objection to participation in war crystallized to such a point that he truly became a conscientious objector.

Since petitioner has made such a prima facie case, his petition for habeas corpus should be granted unless there is any evidence to cast doubt upon the sincerity of his claim. The Board gave several reasons for disbelieving the petitioner. First, the Board noted that in his essay, petitioner said that "the teachers and works that had the strongest influence on me were those that \* \* \* exposed the disastrous physical and psychological consequences of intolerance, violence and war." [31] This statement, said the Board, "shows that any pacifist beliefs petitioner may hold existed prior to his enlistment." [32] But all this shows, as the Board correctly said, is that petitioner's pacifist *beliefs* were formed prior to his enlistment. In our opinion, this in no way conflicts with petitioner's assertion that his objection to war, which is based on these beliefs, did not crystallize or become fixed until after he joined the Army.

Second, the Board noted that petitioner stated that one of his teachers, Robert Moore, had a great influence upon the development of his convictions when he was in high school. "The Board considered this as evidence that petitioner's alleged beliefs existed prior to his enlistment." [33] But again, this is evidence of nothing more than the fact that petitioner's pacifist beliefs did not suddenly come into existence after he joined the Army. Rather, as we have noted several times, it is true that his *beliefs* did form prior to his enlistment. But again, this does not cast doubt upon, or conflict with, his assertion that his *objection* to participation in war did not crystallize into its final form until after he enlisted.

Next, the Board stated that petitioner listed in his essay a number of actions taken by him before his enlistment which showed his pacifist views, but he mentioned no such actions which occurred after he enlisted. In the essay, however, petitioner explained that these actions, which included taking part in peace

29. Letter dated August 6, 1970, written by Congressman George Bush to the Commanding Officer of Henry Grant Thomas, Jr. at 2–3.

30. Petitioner's essay at 10.

31. *Id.* at 6.

32. Army Conscientious Objector Review Board Record of Proceedings at 2.

33. *Id.* at 3.

marches, writing his Congressman and putting peace posters on his car, were only expressions of his pacifist beliefs, not of a fixed objection to participation in war in any form. At that point, petitioner claims, he had not yet reached the stage where he truly objected to participation in war in any form. Petitioner went on to say that a true conscientious objector does not merely express his pacifist beliefs, as he had done before he joined the Army. Rather, petitioner said, a true conscientious objector must *act* upon his beliefs as well as express them. This he has only done since his enlistment, because it is only now that he is seeking to sever his ties with the military. "[I]n the final analysis the only beliefs that are valid are those that are not simply expressed, but acted upon as well. Elements in my past may demonstrate the consistency of my convictions, but only my present action—resignation from the military—can prove their depth." [34] We believe petitioner's explanation is reasonable and that it does not cast doubt on his claim that his conscientious objection to war in any form became fixed only after he enlisted.

The Board next said that the letter of recommendation written by petitioner's high school teacher Robert Moore "shows petitioner's alleged beliefs to have been developed during his years in high school and not subsequent to his enlistment." [35] But this letter did not say that petitioner was a conscientious objector at that time or even that he was definitely a pacifist. The most that can be attributed to Mr. Moore's letter is that it is evidence that petitioner's pacifist views were forming or beginning to take shape at the time he was in high school. And, as we have said more than once, even if Mr. Moore's letter had shown that petitioner's beliefs did develop during his high school years, this does not conflict in any way with petitioner's assertion that it was only after his enlistment that his objec-

tion to participation in war in any form became fixed.

Finally, the Board pointed to a letter of recommendation written by Emmett H. Fremaux, Jr. According to the Board, "This gentleman showed how petitioner's beliefs were formed prior to his enlistment. 'At the time Mr. Thomas made his decision to enlist in the Army Reserve, we discussed directly the possibility of applying for classification as a C. O. At that time he expressed deep concern over the inconsistency between the principles he espoused and his decision to become a part of the military.' " [36] But this passage can be more fairly evaluated if it is quoted together with the subsequent part of Mr. Fremaux's letter. Let us therefore place the passage quoted by the Board back into context and examine a larger portion of the letter:

"At the time Mr. Thomas made his decision to enlist in the Army Reserve, we discussed directly the possibility of applying for classification as a C. O. At that time he expressed deep concern over the inconsistency between the principles he espoused and his decision to become a part of the military. He stated that although he strongly objected to the nature, methods, and goals of the military, he doubted that he could in completely good conscience refuse military service on the basis of his commitment to those principles.

"About six months after joining the Army, Mr. Thomas became a conscientious objector. In a serious talk we had on the subject in June [the petitioner had enlisted in the preceding January], it became clear to me that Mr. Thomas no longer felt it was possible for him to act in a manner that was inconsistent with his beliefs. The principles he had held to be true in theory had become his real convictions; and he stated to me that he felt his convictions could have meaning only if he acted in complete accordance

---

34. Petitioner's essay at 14.

35. Army Conscientious Objector Review Board Record of Proceedings at 3.

36. *Ibid.*

with them. I did not find that the content of Mr. Thomas' beliefs had changed in any decisive way other than the depth of his commitment to act in accordance with them. The principles and beliefs which he had long held had become crystallized and solidified into a comprehensive personal moral code to which he was committed in his personal life with the strength of the deepest religious conviction." [37]

It is the opinion of this Court that Mr. Fremaux's letter does not cast any doubt whatsoever on petitioner's assertion that his objection to participation in war became fixed only after he entered military service. Rather, we feel that this letter corroborates and strengthens his claim. Mr. Fremaux clearly stated that at the time petitioner joined the Army, he did have pacifist beliefs, but that they had not developed to such a stage as to result in the crystallization of his objection to participation in war in any form. Thus, Mr. Fremaux said that when petitioner joined the Army, his pacifist views were so undeveloped that he could not in completely good conscience refuse military service. According to Mr. Fremaux's letter it was only after six months of military service that petitioner became a true conscientious objector and felt that he could no longer remain part of the military.

In conclusion, this Court can find no facts in the record which cast doubt upon petitioner's assertion that his objection to participation in war in any form did not become fixed until after his entry into the Army.

For the foregoing reasons we must hold that the Board's denial of petitioner's request for discharge as a conscientious objector is unsupported by any basis in fact. Consequently, it is the holding of this Court that the petition of Henry Grant Thomas, Jr. for a writ of habeas corpus be granted. It is there- fore ordered that this case be remanded to the Army Conscientious Objector Review Board with directions to act in accordance with this judgment.

37. Letter dated July 30, 1970, written by Emmett H. Fremaux, Jr. to the Commanding Officer of Henry Grant Thomas, Jr.