UNITED STATES ex rel. Pfc. Christopher H. COATES, 2362375 USMCR(K), MaintBn, 4th FSR, Charlotte, North Carolina, Plaintiff and Petitioner,

v.

Melvin LAIRD, Secretary of Defense of the United States, et al., Defendants and Respondents.

No. 2790.

United States District Court, W. D. North Carolina, Charlotte Division.

March 30, 1973.

Adam Stein, Chapel Hill, N. C., W. Samuel Woodard, Charlotte, N. C., Thomas F. Loflin, III, Loflin, Anderson & Loflin, Durham, N. C., for plaintiff and petitioner.

Keith S. Snyder, U. S. Atty., Asheville, N. C., David B. Sentelle and Hugh J. Beard, Jr., Asst. U. S. Attys., Charlotte, N. C., for defendants and respondents.

McMILLAN, District Judge.

Christopher Coates, petitioner, is a native of North Carolina, a graduate in college and law at the University of

North Carolina at Chapel Hill, and a practicing lawyer. He was raised in the Camp Greene (Charlotte) Presbyterian Church and many of his convictions are traced to his early Christian training. He was an Eagle Scout and on at least one occasion preached the Sunday sermon in his home church on a touchy moral subject of controversial nature (race relations). His father, an elder in the church, is a Purple Heart veteran of World War II.

Coates enlisted in the Marine Corps Reserve in 1969, and served six months of active duty, until September 26, 1969. On August 17, 1970, Coates requested discharge from the Marines, on the basis that his incipient conscientious objection to military service had in recent months crystallized into a firm conviction.

In support of his conscientious objection Coates submitted a statement which includes in part the following:

"1. I do not base this claim for I–O status upon a religious belief.

From my early youth and until about two years ago, I attended Camp Green Presbyterian Church (in Charlotte, North Carolina) functions regularly. This extended involvement with organized religion and Christian teachings accentuated to me the importance of my relationship with other people and the duties that arise from the relationship.

During my college and law school days, there occurred a steady mitigation of my belief in a Supreme Being until, as I said, about two years ago I could not longer accept Christian dogma and thus became agnostic. (Today, I prefer to view Jesus Christ as a great philosopher rather than the Son of God.) However, my early acceptance of Christian teachings pertaining to my duties to others was not eroded and remains the basis for many of my presently held moral and ethical precepts.

The portion of my moral code that relates directly to the question of my I–O status dictates that individuals should determine in every situation of significant consequence what is morally acceptable and what is morally objectionable. The criterion employed to ascertain acceptable or objectionable behavior when the situation concerns others is the one established by many great thinkers throughout history, not the least of whom was Christ. This criterion is applied by asking how I would like others to treat me if I were in their position, assuming that 'others' are people whose desires are governed by the same moral code.

\* \* \* \* \* \*

This above stated moral code is not simply a philosophical theory to be casually discussed during a 'Bull Session' or to be compositionally debated in a college term paper. I think that if man is to ever achieve peace among the differing national, racial, and political groups, it is essential that this moral code be accepted and applied to man's activities. Let me add that the application of this moral code is not limited to world-wide problems such as race relations or the Indo China War but is also applicable to my day to day personal activities with family, friends, or anyone else who enters my sphere of contact. This code is all encompassing and I endeavor to apply it to all of my behavior.

Because of my agnosticism, I do not claim to be cognizant of what happens to humans after they die. Therefore, I place extreme emphasis on the value of life to each human and the well-being of people while they are alive. Total peace, the eradication of poverty and the establishment of humanitarian relationships between all men should be man's foremost goals, and I believe the above outlined approach to life will result in the fulfillment of these goals.

\* \* \* \* \* \*

Another question frequently raised is whether I am against all wars or just the one that is presently being waged in Southeast Asia. I am

against all wars since in every violent conflict one country is mistreating or has mistreated another country. However, I would participate in wars where my country had wrongfully been attacked. But I would never co-operate with my government in the perpetration of a war in which my country is immorally involved in as, according to my moral code, is the case in Southeast Asia.

2. The basic ideas that I possess to-day are not the product of an over-night conversion. It would be impos-sible to signify any particular time, place, person, or book that has had an overwhelming influence upon my pres-ently held moral and ethical precepts. Instead, my moral code is a product of a long slow alternation and elucidation of my values which began for all in-tents and purposes about the time I entered college in 1963 and still con-tinue today.

Concerning the writers that have influenced my moral code, I would say that on the matter of nonsubordina-tion of one's mind and conscience to the government Jesus Christ, Henry David Thoreau, and Ayn Rand have been the most persuasive. On the subject of the war in Southeast Asia the writings of Senator J. William Fulbright, Norman Mailer, David Del-linger, and Alfred Hassler have had a tremendous impact on my thinking.

\*    \*    \*    \*    \*    \*

4. I would definitely use force in self-defense in defense of anyone that I saw who was being wrongfully at-tacked, and in defense of my country. I cannot justify the use of aggressive force. It seems to me that the above is the logical result of my moral code outlined in answer (B)(1). If X is the aggressor, then X is not treating the person he is attacking in the way in which X himself would desire to be treated. However, if X were attacked by Y, then it is not immoral for X to use force in defense of himself since Y would not choose to sustain the at-tack without resorting to use force for protection if he (Y) were in X's posi-tion.

My objections against the use of force except in the above stated excep-tions are two fold. Firstly, the use of force obviously results in enormous human misery. Secondly, I am ex-tremely skeptical of the ability of the force in the solution to problems. It seems that in most cases the applica-tion of force worsens rather than solves the problems.

5. The most palpable manifestation of my sincerity concerning my moral code is the fact that I have intention-ally failed to attend my reserve drills with the full knowledge that those ab-sences will result in my being activat-ed into the regular Marine Corps. If I–O status is denied, then I will refuse to cooperate with the authorities when I report to active duty. Considering the fact that I could spend a number of years in prison for this action and that this incarceration could also de-stroy my opportunity to practice law (a goal I have spent 5½ years in col-lege and law school pursuing), I think it reasonable to conclude from the sit-uation that I am sincere in my words and deeds."

\*    \*    \*    \*    \*    \*

Coates also offered statements from various friends and acquaintances as fol-lows:

Irvin W. Hankins III, a Navy lieuten-ant on active duty, says that he had "complete confidence in [Coates'] sincer-ity of principle and dedication of pur-pose"; that if saving his own skin had been Coates' motive he could have re-mained quiet and inconspicuous and completed his military obligation by tak-ing part in weekend reserve drills; that Coates' conscientious views about war were of several years' duration and were completely sincere.

L/Corporal Kenneth Hipp, an ac-quaintance of twelve years, writes that Coates' concern for human suffering was obvious as early as 1962; that

Coates had *"never abandoned the basic tenets of Christianity"*; that he "refused to sidestep matters touching his conscience"; that his joining the Marines, during his mother's terminal cancer illness, had actually been uncharacteristic; that he managed his boot training at Parris Island, South Carolina, without pleasure, and did not yet exhibit "the total revulsion to military service that he has since developed"; that he is sincere in "his *conscientious objection to military service* and to the Viet Nam war"; and that

> "our country's willingness to grant conscientious objector status to individuals such as Harry Christopher Coates—who are fervently committed against 'war' and who can, as free men, contribute to curing out ills—is one factor that keeps us away from the brink over which other countries have fallen."

A classmate, Mary Lou Nussbaum, writes that Coates was sincere in his views that "an individual's philosophy should not be subordinated to the powers of state."

Lucas D. Solomon, a friend of ten years' standing, says that Coates' beliefs were of deeply conscientious conviction and rational character.

On October 7, 1970, *without any findings of fact or statement of any reasons whatever,* A. P. Barry of Marine Corps headquarters issued an order to the 6th Marine Corps District in Atlanta:

> "1. Inform the subject named Marine that his request . . . for discharge as a conscientious objector is disapproved.
>
> "2. He can be assigned any normal combat duties, including those requiring the bearing and use of arms in combat . . ."

The Marine file, apparently available to the Marine Corps headquarters when the decision was made, contained three further reports:

1. From Lieutenant E. Dean Coffey, Marine Corps Chaplain, expressing doubt as to the sincerity of Coates'

objection because (a) even though Coates based his objection on Jesus Christ's teachings, he did not accept Christ as a Supreme Being; (b) Coates considers the Viet Nam war immoral; (c) Coates would fight in defense of himself and others if attacked. Concluding, Coffey says:

> "Furthermore, I further believe, from his own words, that the only real reason for Mr. Coates' request for release from his military obligation is his disagreement with the present U.S. foreign policy, which to me does not offer a basis for conscientious objection. Particularity, since his 'moral' objection to the foreign policy bears no relationship to a Supreme Being. I would recommend his request be denied." [sic]

2. From Dr. E. M. Kelman, Commander, U.S. Naval Reserve, saying in relevant part that (a) although Coates would fight to defend the United States from aggression, he would not be willing to serve in the military even as a noncombatant; and (b) Coates' conscientious objection *"is not based on religious grounds."*

3. From Major W. D. Smith, U.S. Marine Corps, Commanding Officer of the Charlotte Maintenance Battalion, expressing the opinions that (a) Coates' conscientious objection is not *based on* religious teachings or beliefs; (b) Coates is sincere in wanting to get out of the military, but not in his objection to war; (c) although Coates is opposed to our Southeast Asia policy, *"he is not opposed to war."* [There is no evidence at all to support this last statement.]

Conscientious objection as a basis for relief from military service is based on the Universal Military Training and Service Act, Section 6(j) (50 U.S.C. App. § 456(j)), which reads as follows:

> "(j) Nothing contained in this title [sections 451, 453, 454, 455, 456 and 458–471 of this Appendix] shall be construed to require any person to be subject to combatant training and service in the armed forces of the

United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code. Any person claiming exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the armed forces under this title, [sections 451, 453, 454, 455, 456 and 458–471 of this Appendix], be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be ordered by his local board, subject to such regulations as the President may prescribe, to perform for a period equal to the period prescribed in section 4(b) [section 454(b) of this Appendix] such civilian work contributing to the maintenance of the national health, safety, or interest as the Director may deem appropriate and any such person who knowingly fails or neglects to obey any such order from his local board shall be deemed, for the purposes of section 12 of this title [section 462 of this Appendix], to have knowingly failed or neglected to perform a duty required of him under this title [sections 451, 453, 454, 455, 456 and 458–471 of this Appendix]. The Director shall be responsible for finding civilian work for persons exempted from training and service under this subsection and for the placement of such persons in appropriate civilian work contributing to the maintenance of the national health, safety, or interest."

█ Several eloquent opinions of the United States Supreme Court have made it clear that Section 6(j) is not to be construed stingily but is to be construed with respect to conscience rather than to society's compulsion of conscience. In United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), the Supreme Court held that one who did not formally claim to believe in a "Supreme Being" could, nevertheless, have a valid conscientious objection if his belief

"is sincere and meaningful [and] occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption." 380 U.S. at 166, 85 S.Ct. at 854.

The Court referred (page 174, 85 S.Ct. at 858) to the variety of religious sects in America, including some who

"think of religion as a way of life envisioning as its ultimate goal the day when all men can live together in perfect understanding and peace."

In Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), the petitioner had been brought up in a religious home; he asserted conscientious scruples against taking part in wars where people were killed; he was willing to go to jail rather than violate his conscience by serving in the armed forces, but he disclaimed any contention that his beliefs were based upon religious training. The lower court found that his beliefs were held "with the strength of more traditional religious convictions." (398 U.S. 333, 337, 90 S.Ct. 1792, 1795.)

The Supreme Court reversed a lower circuit court decision and held that Welsh was erroneously convicted of draft evasion. The Court held that what is necessary for a conscientious objection to be "religious" is

"that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong *and that these beliefs be held with the strength of* traditional religious convictions." 398 U.S. 333, 340, 90 S.Ct. 1792, 1796. (Emphasis added.)

The Court also said that "religious" is such a complex word that the government was not entitled to base its finding

purely upon the registrant's statement that his beliefs were "non-religious."

■ In light of the *Welsh* and *Seeger* decisions, it appears that all three of the military people (Chaplain Coffey, Dr. Kelman and Major Smith) who made reports to the Marine headquarters were erroneous in their conclusion or opinion that Coates' objection should be rejected because it was not "religious" and was not based on acceptance of or belief in a "Supreme Being." This erroneous basis is perpetuated, in fact, in the *ex post facto* rationale of the decision which was filed by the government on July 24, 1972, in the form of a letter from General Spielman, Deputy Director of Personnel, United States Marine Corps. General Spielman also in this 1972 explanation of the 1970 decision determined that petitioner

> "would not suffer from a loss of rest or peace if he continued to serve in the United States Marine Corps Reserve."

Thus, after extended litigation, the respondents are still relying upon one clearly erroneous ground and one ground (no loss of "rest or peace") which was not claimed and was never litigated.

The one argument of any mild legitimacy to which the Marines adhere is that Coates' objection was selective only and that he was not opposed to war in any form. Indeed they urge the court that even though there might be improper reasons shown in the record, the decision should stand because of this possible "basis in fact" for the ruling that was made.

The trouble with that proposition is that since no facts were found and no reasons were given, the court would have to guess what the reasons were; and courts should not be required to speculate about reasons for decisions which vitally and seriously affect human liberty. Where no reasons are given, the decision may have been as much upon the erroneous bases revealed by the record as upon any proper basis that may appear.

In a case similar in principle to the one at bar, Cassius Clay (Mohammed Ali) was convicted of refusal to submit to induction. The hearing officer recommended that Clay's conscientious objection be allowed. Upon intervention by the Department of Justice, the draft appeal board denied the claim without a statement of reasons. He was tried and convicted and sentenced, and appealed from the sentence. The government contended that the objection was not religious; that it was not sincere and that it was also invalid because it was a selective objection instead of an objection to war in any form. Two of the grounds given by the government were invalid, but the third (war in any form) was assumed to be valid.

The Supreme Court held [Clay v. United States, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971)] that where some of the possible though unstated grounds for the decision were invalid and some were valid, it was impossible to tell which grounds the authority actually used as a basis for the decision, and that the conviction of Clay for refusing to obey the draft should be reversed. The Court cites the long-standing principle of Sicurella v. United States, 348 U.S. 385, 75 S.Ct. 403, 99 L. Ed. 436 (1955) and similar cases, that where it is not clear that the draft authorities relied upon proper grounds and where they might have relied upon an improper ground, the proceeding was invalid.

■ The same theory which voids a criminal conviction for draft evasion where invalid reasons might have been used should also apply where the government authority in question is not a civilian draft board or a criminal court but is a military board; military components should be governed by the same essential conscientious objection standards as draft boards. See Peckat v. Lutz, 451 F.2d 366 (4th Cir. 1971).

It therefore appears that even though conceivably petitioner might ultimately have failed to establish his conscientious objector status had he been given fair

treatment, he is, nevertheless, entitled to relief because at least one (and possibly two) of the major reasons on which the defendants may have relied is invalid.

Considerable emphasis has been placed upon whether in his original application Coates established a *prima facie* case of entitlement to the requested classification. In light of the foregoing considerations, this issue does not appear to be one of key importance.

 However, a fair reading of the evidence reveals that, although contrary inferences are of course possible, Coates *did* indeed state a *prima facie* and well-nigh totally convincing case of conscientious objection to war in any form. The evidence, among other things, shows the following:

(a) That he is opposed to all wars;

(b) That his opposition is based upon moral and ethical convictions;

(c) That his beliefs are held with the strength of traditional religious convictions (one witness says that although Coates disclaims a religious basis for his objection, "He never abandoned the basic tenets of Christianity.");

(d) That he considers the Viet Nam war especially immoral; and

(e) That he would fight if his country were attacked.

Even under the rule of Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed. 168 (1971) and Negre v. Larsen, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), Coates has stated facts which, if true, entitle him to exemption. His objection to all wars is in fact more strongly stated than the objections in United States v. O'Bryan, 450 F.2d 365 (6th Cir. 1971) and United States v. Coffey, 429 F.2d 401 (9th Cir. 1970), in both of which the Court held that a *prima facie* case had been stated. Under this analysis the respondents were clearly required to set out reasons for their decision, and the issue decided in United States v. Wood, 454 F.2d 765 (4th Cir. 1972) (statement of reasons not required where applicant fails to establish a *prima facie* case), is not presented.

 In this court's original order of February 18, 1971, decision was postponed pending the Supreme Court's final action in *Negre* and *Gillette, supra*, on the question of selective objection to the Viet Nam war. At that time I had not thoroughly studied all the details of the record nor grappled with the question whether a *prima facie* case is stated apart from the question of selective objection. After studying the evidence and the appropriate authorities at considerable length I am now of the opinions as stated above that Coates did state a *prima facie* case to the Marine authorities and was therefore entitled to a statement of their reasons and further, that even apart from the question of *prima facie* case he is entitled to relief because obviously the decision of the military was based either upon no reason or upon improper reasons as set out in the file.

Therefore, the petitioner's request for discharge was erroneously denied.